# CASES

## ARGUED AND DETERMINED

IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS AND THE CIRCUIT AND DISTRICT COURTS.

---

## THE GERMANIC.

(Circuit Court of Appeals, Second Circuit. July 1, 1903.)

Nos. 151; 152.

1. SHIPPING—INJURY TO CARGO—HARTER ACT

The trend of judicial decision in the United States has been to construe the Harter act strictly, and not to extend the carrier's exemption from liability to doubtful and uncertain cases, but to leave such liability as it was defined and enforced by the law maritime and by the common law, unless the act plainly and unequivocally asserts a different liability.

2. SAME—SINKING OF VESSEL AT DOCK—NEGLIGENT UNLOADING.

The unloading of cargo in the port of discharge by stevedores has no relation to the "management of the vessel," within the meaning of the third section of the Harter act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946]), not being an act done with any view to such management, but relates to the "care or delivery of cargo," within the meaning of the first section; and where by the negligent and improper manner in which it was done it brought about a condition of instability in a ship, which, owing to a large accumulation of ice above her upper deck, rendered her top-heavy, and she rolled over and sank at her dock, injuring the remaining cargo, she is liable for the damage, although other acts done or omitted in the management of the vessel may have contributed to the injury.

Wallace, Circuit Judge, dissenting.

Appeals from the District Court of the United States for the Southern District of New York.

For opinion below, see 107 Fed. 294.

On appeal from a decree of the District Court of the Southern District of New York finding the Germanic in fault and awarding damages to libelants for loss of cargo due to the stranding of the steamer while lying at pier 45 North river, during the night of Monday, February 13, 1899.

¶ 1. Statutory exemption of shipowners from liability, see note to Nord-Deutscher Lloyd v. Insurance Co. of North America, 49 C. C. A. 11.

Everett P. Wheeler, for appellant.

Walter F. Taylor, for appellees Aitken and others.

Wilhelmus Mynderse, for appellees Insurance Company of North America and others.

Before WALLACE, LACOMBE, and COXE, Circuit Judges.

COXE, Circuit Judge. The facts are stated with great care and accuracy by the District Judge and need not be repeated here. The Germanic (D. C.) 107 Fed. 294. His statement is challenged in a few unimportant particulars, but no error is pointed out which, in our judgment, affects the correctness of his conclusions. It is said, for instance, that the finding that the wind at the time of the first list to port was northerly is incorrect, the wind having suddenly shifted to the northwest about 4 p. m. It is also argued that the judge's estimate of the weight of ice on the steamer's decks and upper works at 213 tons is too high. We are inclined to regard this as a conservative estimate and much more reliable than the conjecture of the master who placed the weight at 180 tons. But even if the conclusions of the appellant in both these particulars be accepted as correct the same deductions follow. So far as the weight of the ice is concerned it is practically conceded by the libelants' counsel that the difference in the two estimates is immaterial. He says:

"The exact determination of this amount is unimportant, and for the sake of the argument we assume the correctness of Judge Brown's figures."

The District Court found that the damages were caused by two sudden lurches to port, the first knocking off the cover of the coal port and the second carrying the bottom of the port below the water line, and that these lurches were produced by the unstable and top-heavy condition of the steamer arising from the inconsiderate unloading of nearly all of her cargo without any regard to the great weight of ice and snow above her decks. We fully concur in these conclusions and in the reasoning by which they are supported and deem it unnecessary to add anything to the opinion of the district judge.

The contention that the Harter act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946]) constitutes a complete defense to the action necessitates further observation. The first section of the act is evidently in the interest of the shipper and was intended for his protection. It provides that it shall be unlawful to insert in a bill of lading any agreement relieving the vessel or her owner from liability "for loss or damage arising from negligence, fault, or failure in proper loading, stowage, custody, care, or proper delivery of any and all lawful merchandise or property committed to its or their charge." All words and clauses of such import inserted in bills of lading are declared to be "null and void and of no effect." It is plain that by virtue of this section a carrier cannot avoid liability for negligence in the loading, stowage, custody, care and delivery of merchandise.

The second section (27 Stat. 445 [U. S. Comp. St. 1901, p. 2946]) is also in the interest of the shipper. It makes it unlawful to insert

in a bill of lading any agreement whereby the obligation of the owner of a vessel "to exercise due diligence properly to equip  *  *  * and to make said vessel seaworthy  *  *  *  or whereby the obligations of the master, officers, agents, or servants to carefully handle and stow her cargo and to care for and properly deliver the same, shall in any wise be lessened, weakenèd, or avoided." This section recognizes the obligation to use due diligence to provide a seaworthy vessel and carefully to handle, stow, care for and deliver the cargo and makes it unlawful to insert a clause whereby these obligations are avoided or weakened.

The third section (27 Stat. 445 [U. S. Comp. St. 1901, p. 2946]), which is relied upon by appellant, is in the interest of the carrier and is evidently intended as a compensation for the loss of his right to limit his liability as provided in the preceding sections, the effort of the lawmakers, apparently, being to adjust the rights and obligations of each upon a fair and reasonable basis. The section provides that if the owner of a vessel shall exercise due diligence to make the vessel seaworthy and properly manned, equipped and supplied then and in that case neither the vessel nor her owner shall be responsible for damages "resulting from faults or errors in navigation or in the management of said vessel." Reading these provisions together and in the light of the interpretation placed upon them by the courts it seems plain that the carrier is still liable for negligence in the loading, stowage, custody, care, handling and delivery of the cargo and that neither the carrier nor the vessel is liable for faults or errors in the navigation or in the management of the vessel, but in order to avail himself of this exemption he must use due diligence to provide a seaworthy vessel properly manned and equipped.

The Supreme Court in the case of The Carib Prince, 170 U. S. 655, 18 Sup. Ct. 753, 42 L. Ed. 1181, decided that the act did not exempt the vessel from injury occasioned by a latent defect in the peak ballast tank caused by a broken rivet head 'which left a hole through which the water entered and injured the cargo. It was also decided that the third section exempted from liability only where the damage resulted from dangers of the sea or faults in the navigation or management of the ship. The C. W. Elphicke, 122 Fed. 439.

In The Irrawaddy, 171 U. S. 187, 18 Sup. Ct. 831, 43 L. Ed. 130, the court, at page 192, 171 U. S., page 833, 18 Sup. Ct., 43 L. Ed. 130, says :

"Plainly the main purposes of the act were to relieve the shipowner from liability for latent defects, not discoverable by the utmost care and diligence, and, in event that he has exercised due diligence to make his vessel seaworthy, to exempt him and the ship from responsibility for damage or loss resulting from faults or errors in navigation or in the management of the vessel."

The court refused to extend the act so as to permit the owner to share in the benefits of a general average contribution to meet losses due to faults in management and navigation.

In the case of Knott v. Botany Mills, 179 U. S. 69, 21 Sup. Ct. 30, 45 L. Ed. 90, a cargo of wool was injured by drainage from wet sugar taken on at a subsequent port. At a third port cargo aft was

discharged so that the ship was two feet down by the head, causing the drainage to flow forward and injure the wool. The supreme court held the damage was the result of fault in the loading or stowage of the cargo and not of a fault in the navigation or management of the ship.

In The Manitoba (D. C.) 104 Fed. 145, the court refused to extend the exemptions of the Harter act to a case where, through insufficient care during loading, a cargo port was left open on sailing. It was held that the condition of the port being unknown to the officers of the vessel made her unseaworthy as to cargo stowed in that compartment and that there was also "a failure in the proper stowage and care of the goods" within the first section of the act.` At page 155 the court says:

"To entitle the ship and owner, however, to exemption under the third section of the Harter act, it is not enough to show that some of the several causes therein named contributed to the loss. To exempt the shipowner, the statute requires that the damage must have 'resulted' from one or more of those causes; and this requires that some one or more of those causes must have been the real, substantial or efficient cause of the loss. But if the causes of the loss are several, and one of them is negligence of the carrier not within section three and a sea peril has become operative and produced damage not by itself per se, but only in consequence of the carrier's negligence, which has made it operative, then the rule long applied as between ship and shipper in the construction of bills of lading (and the same rule must be applied here), is that the negligence and not the sea peril, is to be deemed the efficient and proximate cause of the loss. * * * In such cases the damage does not properly 'result' so much from the sea peril as from the negligence that has given opportunity for the operation of that peril."

The leading case in which the ship has been relieved from liability is The Silvia, 171 U. S. 462, 19 Sup. Ct. 7, 43 L. Ed. 241. The court there held that the vessel was actually seaworthy at the inception of the voyage and that the injury to the cargo was occasioned by the neglect to close the iron shutter of a port hole, the glass cover being broken during the voyage, and that this was a fault arising in the "navigation or management of the ship." The court says:

"This case does not require a comprehensive definition of the words 'navigation' and 'management' of a vessel, within the meaning of the act of Congress. They might not include stowage of cargo, not affecting the fitness of the ship to carry her cargo. But they do include, at least, the control, during the voyage, of everything with which the vessel is equipped for the purpose of protecting her and her cargo against the 'inroad of the seas.'"

In Int. Nav. Co. v. Farr & Bailey Co., 181 U. S. 218, 21 Sup. Ct. 591, 45 L. Ed. 830, the court refused to extend the doctrine of The Silvia to a case where damage resulted from water admitted through an open port as the vessel rolled in a heavy sea, it appearing that neither the glass cover nor the iron dummy was properly fastened when the vessel left Liverpool.

In The Glenochil (1896) Prob. Div. 10, 8 Asp. N. S. 218, the negligence consisted in the mismanagement of part of the appliances of the ship. In order to stiffen her so as to complete the discharge of the cargo it became necessary to fill one of the water ballast tanks. The tank was accordingly filled, but owing to an injury received during the voyage water was admitted from the tank to the cargo and

damage resulted. The filling of the tank was held to be an act done in the management of the ship.

The other authorities relied on by appellant, upon this branch of the case, are the decisions of foreign tribunals which it is unnecessary to examine in detail as they shed little light upon the point in controversy, especially in view of the opinions of the supreme court which, though based upon differing facts, seem to lead to contrary conclusions. These authorities, and many others bearing upon the construction of the Harter act, will be found in the comprehensive opinion of the court in The Manitoba, supra.

It must be admitted that the trend of judicial decision in the United States has been to construe the Harter act strictly and not to extend the carrier's exemption from liability to doubtful and uncertain cases. The tendency has been to leave the liability of the ship and the owner as it was defined and enforced by the law maritime and by the common law unless the act plainly and unequivocally asserts a different liability. It is idle to disguise the fact that the circumstances in the case at bar naturally predispose the court to hold the vessel liable unless her exemption be made apparent by the express terms of the act. In other words, it is not a case where the act should be strained to shield the ship. Where a staunch and strong vessel arrives safely at her destination and subsequently sinks at her berth, after being made top-heavy by the careless and premature removal of cargo, the situation compels the conclusion that the lawmakers could not have intended that the loss should fall upon the innocent cargo owners and that there should be a complete exemption from liability on the part of those whose negligence caused the loss. Such a result would be foreign to the intent and purpose of the act.

It is obvious that "faults or errors in the management of the vessel" do not include "fault or failure in proper loading, stowage, custody, care or delivery of" cargo. If this were otherwise the first and third sections would be antagonistic and the vessel which is made liable for improper handling of the cargo by the first section is relieved from liability by the third section. This distinction between the vessel and her cargo and between the management of the vessel and the management of her cargo is distinctly recognized in the act and in the decisions interpreting it. It is true that the word "unloading" is not used in the first section, but as pointed out in the opinion below, and in the briefs, it is certainly excluded from the meaning of the phrase "management.of the ship" and so the obligation to discharge the cargo properly remains as it existed prior to the passage of the act. Indeed, it would not be an unnatural or strained construction to hold that the prohibition against any attempt to relieve from liability for negligence in proper "loading, stowage, custody, care or delivery" of cargo includes negligence in unloading as well.

We are of the opinion that a condition of instability brought about by the improper unloading, care and custody of the cargo is not a fault in the management of the vessel. This distinction was clearly recognized in the Botany Mills Case, supra. In that case by the careless discharge of cargo at Para the vessel was trimmed by the head

and the drainage ran into the compartment near the bow where the wool was stowed and injured it. In the case at bar by the careless discharge of cargo at New York the vessel became top-heavy and lurched violently to port until an open coal port was carried down below the water line, sinking the ship and injuring all the merchandise on board. Other faults may have combined to produce this result, but the improper loading and care of the cargo was the initial cause and produced a condition of affairs which gave to acts and omissions, harmless and even laudable in themselves, the appearance of grave and culpable errors. Conceding, arguendo, that loading the coal in the side bunkers helped to produce the condition of instability and that it was done in "the management of the vessel," it is by no means conclusive of appellant's liability. The only deduction to be drawn is that this fault, for which the vessel is not liable, contributed with other faults, for which she is liable, to produce the disaster.

The same conclusion would follow were a similar concession made regarding the failure to supply a substitute for the lost port cover. Where a disaster is due to a combination of negligent acts liability is established by the proof of one of these acts and the party so charged will not be exculpated by showing that other faults for which he is not responsible contributed to produce the result. Whether this exemption from liability for these contributing acts be established by proof or is the result of an express statute is immaterial. It is enough that the party charged with negligence has been proved guilty of negligence.

The act complained of, namely, the hurried and improvident removal of the cargo, had no relation to the management of the ship, as such. It was not undertaken with the intent to benefit, influence or change her in the remotest particular. It dealt with the cargo as distinguished from the ship. The fact that the unskillful loading by a stevedore may affect injuriously the sailing qualities of the ship does not make the loading an act undertaken "in the management of said vessel" any more than the loading or unloading of a freight car can be regarded as part of the management of a railroad train. This proposition is well stated in the brief of the libelant Aitken, as follows:

"The fact that an act primarily having to do with cargo must incidentally affect the ship, does not bring it within the class of acts done in the management of the ship. If the particular manner of performance adopted is not adopted with a view to its effect on the ship, but does affect the ship in a way that causes damage to cargo, the ship is not exempted from liability. * * * The controlling fact is that the effect on the ship is produced without intention and by accident. The negligence is in the manner of performing the act intended, to wit, the act having to do with cargo. It is not in the management of the ship because no act intended to affect the welfare of the ship is being performed."

The evidence is overwhelming that after the Germanic was made fast she was given in charge of the "shore agents" of the owner and they alone assumed direction of the discharging and loading of cargo and preparing her for the return voyage. The officers and crew had nothing whatever to do with the employment of stevedores or the discharging, loading and coaling of the ship. All these operations were carried on by the shore department under orders from the dock.

They had charge of the unloading and loading of cargo, determined the place of stowage and the order in which cargo was taken in. It is probably true that the master has the right to interfere to protect the ship from the carelessness of the stevedores, but it is an authority seldom exercised. The general agent of the claimant at New York testified that he was unable to give an instance where the master has interfered with the judgment of the superintendent of the pier. There have been occasions, however, when the master has protested against the action of the superintendent in placing weight in certain parts of the ship and, upon appeal to the general agent, the protest has been sustained. As to the general proposition there can be no doubt that the stevedores had nothing to do with the management of the ship and the master and crew had nothing to do with the handling of the cargo. If to the negligent unloading of the stevedores can be imputed the primal fault, it does not become a fault in the management of the ship because the master used his best endeavor to remedy it. He did not cause the unstable condition, the damage did not result from his management; he simply endeavored to prevent the threatened disaster.

The merchandise loaded on the Germanic in New York for the outward bound voyage stands upon a somewhat different footing from that of the incoming cargo. In no respect, however, are the points of divergence favorable to the claimant and it is, therefore, unnecessary to discuss them. We are of the opinion that the damage was produced by negligent unloading, that this was not done in the management of the vessel, and that the vessel is not relieved from liability by the third section of the Harter act.

The decree of the District Court is affirmed with interest and costs.

WALLACE, Circuit Judge (dissenting). For the loss accruing to that part of the cargo of the Germanic which she carried from Liverpool, I think the libelants are not entitled to recover. As respects this part of the cargo, inasmuch as when its carriage began the Germanic was in all respects seaworthy, and properly manned, supplied, and equipped, if the loss resulted from "faults or errors in navigation or in the management" of the vessel, the vessel and her owners are exonerated from liability by the third section of the Harter act. The loss was caused by the sinking of the vessel at her dock at the termination of her voyage, while her cargo was being unladen, whereby water damage accrued to the part which had not been removed. It appears that she arrived at her dock Saturday, February 11th, at noon, with a list to starboard caused by the ice which had accumulated during her voyage to such an extent that it incrusted all her forward parts, including the bridge, rigging, and spars as high as the foreyard. On Monday, in the afternoon, when a large part of her cargo in the lower hold and on her orlop and steerage decks had been discharged, she suddenly rolled over to port, and in making this roll lost the cover to one of her coal ports. Thereupon her master undertook to rectify her instability by shifting some of the cargo in the lower hold from the port to the starboard side, and within an hour she rolled back again to her former starboard list. The discharge of her cargo was

then resumed, and coal was taken on board for her next voyage, with the effect of somewhat increasing her starboard list; but shortly after 9 o'clock p. m. she suddenly rolled over again to port, carrying the open port beneath the water line. The water flowed in through this opening faster than the pumps could control it, and she sank at her dock before outside relief could be obtained.

The District Judge found that the two lurches of the vessel to port were attributable to unloading the greater part of her cargo in the lower hold, and on the orlop and steerage decks, when she was top-heavy and unstable because of the ice upon and above her upper deck, and that the disaster was caused by negligence in these respects and in omitting to protect the open coal port. In his opinion he reasoned thus:

"Both contributed to the result—the first, by knocking off the coal port and leaving a large opening exposed; the second, by carrying the bottom of that opening below the water line. Without the second roll, the first would have produced no damage to the cargo. Without the first, the second would probably have carried away the cover, as the first did, and have resulted in substantially the same damage."

After the event it is apparent that it was injudicious, and perhaps culpable, to unload the lower parts of the vessel in her top-heavy condition; but I am not fully satisfied that this was a manifest risk at the time, or one which ought to have been foreseen, or that the unloading would have capsized the vessel, if it had not been for the fierce gale, which sprung up on Monday afternoon, and, deflecting from the building on the pier, bore against the starboard beam of the vessel. The assumption of the District Judge that, if the cover of the coal port had not been knocked off by the first roll, it probably would have been by the second, is merely conjectural. If it would have been knocked off by the second roll, the omission to protect it was not a contributory fault. For present purposes, however, I shall assume that the disaster was caused by the negligence of those in charge of the vessel.

If the acts of negligence were faults in the management of the vessel, it is quite immaterial that they were committed while she was in port. It is also immaterial that the unloading of the vessel was committed mainly or wholly to stevedores, and the suggestion that the master did not exercise any supervision over them, if warranted by the evidence, has no legitimate bearing upon the inquiry. The power of management resided with the master, and it was his duty to exercise it for the safety of the vessel during the time she was being unladen, as well as while she was at sea, and so long as he continued in command. As was said in The Glenochil (1896) Prob. 10:

"It may be that 'navigation' is a term applicable to something done during the voyage, but 'management' is a broader term and applies to everything done and which should be done for the safety and benefit of the vessel while her cargo is on board."

It is not fairly open to debate that the omission to protect the coal port was a fault in the management of the vessel. It was just such an omission which this court and the Supreme Court held to be within

the exemption of the Harter act in the case of The Silvia, 35 U. S. App. 395, 68 Fed. 230, 15 C. C. A. 362; Id., 171 U. S. 462, 19 Sup. Ct. 7, 43 L. Ed. 241. This fault, however, was not the proximate cause of the disaster. "The proximate cause is the efficient cause, the one that necessarily sets the other causes in operation. The causes that are merely incidents of a superior or controlling agency are not the proximate causes and the reasonable ones, though that may be nearer in time to the result. It is only when the causes are independent of each other that the nearest is, of course, to be charged with the disaster." Insurance Company v. Boon, 95 U. S. 117, 130, 24 L. Ed. 395. The real inquiry, therefore, is whether the fault which consisted in not maintaining the stability of the vessel, or in not correcting her instability, was a fault in the management of the vessel. In other words, is it mismanagement of a vessel for the master to direct or permit such a distribution or disposition of the cargo as will endanger the vessel?

It seems to me this question is only capable of being answered in one way, and that any act done or omitted which necessarily affects the safety of the vessel herself, by those in charge of her management, is a fault in the management of the vessel. To read the statute as intended only to comprehend such acts as are intentionally or deliberately done or omitted with a view to the management of the vessel would be to read into it something which it does not contain.

It is urged, however, that the fault here was a fault in the management of the cargo; and that is the view which was adopted by the court below and is accepted by the opinion of this court. If this were correct in fact or in legal theory, it would neither be controlling nor persuasive. There was no fault in the management of the cargo, qua cargo, and the assertion is merely juggling with words. But, if it was a fault in the management of the cargo, it was also one in the management of the vessel, and therefore within the immunity of the third section. In the recent case of Rowson v. Atlantic Transport Company (1903) L. J. Rep. 72, K. B. D. 87, butter carried in the refrigerator of a vessel was injured upon the voyage by neglect in the management of the refrigerating apparatus. The court was of the opinion that, the refrigerating apparatus being a part of the vessel, the fault was one in the management of the vessel, within the meaning of the section. In that case there was more obvious fault in the management of the butter than there was in the management of the cargo in this case; but, because there was a fault in the management of a part of the vessel, it was held to be within the exemption of the third section. Here there was no want of care of the cargo itself.

The exemption created by the third section is not qualified by the terms of the first section. The first section of the statute interdicts shipowners from protecting themselves by special contract with shippers from losses arising from negligence in "proper loading, stowage, custody, care, or proper delivery" of any property committed to their charge. This section refers to acts which directly or primarily affect the cargo. In a broad sense any mismanagement of the vessel which imperils the cargo is a fault; and Congress could hardly have intended by the first section to prohibit shipowners from relieving themselves

from liability for faults in the custody or care of cargo, and by the third section to relieve them from such liability.

The case of The Glenochil, which has been referred to, is directly in point upon the general question. In that case, after the arrival of the vessal at her port of destination, and during the discharge of the cargo, in order to give her stability for the purpose of discharging her cargo, the engineer ran water into the ballast tank, but neglected to ascertain the condition of some of the connections, which had become broken in the heavy weather of the voyage, and through which the water damaged part of the cargo. The principle of the decision was that the fault was not in a matter affecting the cargo, but one in the management of the vessel "in doing something necessary for the safety of the ship herself." In that case what was done was done affirmatively in connection with the management of the vessel. In the present case the act was one of omission instead of commission.

The case of Knott v. Botany Mills, 179 U. S. 69, 21 Sup. Ct. 30, 45 L. Ed. 90, is distinguishable from the present case. The fault there consisted in stowing wet sugar in such juxtaposition to certain bales of wool that, when a certain other part of the cargo was discharged, the drainage from the sugar injured the wool. No injury would have resulted from the original stowage of the wool near the wet sugar, if the discharge of the cargo had not altered the trim of the ship. But the stowage was improper in view of what was subsequently done, and what should have been anticipated as likely to be done. The stowage was the original and proximate cause of the loss, although that cause became operative through a different cause. The court said:

"The wool should not have been stowed forward of the wet sugar, unless care was taken in the other loading, and in all subsequent changes in the loading, to see that the ship should not get down by the head."

I think that, in construing the Harter act, the judgment of the court has been unduly influenced by the supposed hardship of the case. It is suggested in the prevailing opinion that Congress could not have intended that losses should fall upon "innocent" cargo holders under circumstances of such culpable negligence as this case is assumed to disclose. In enacting the statute Congress had under consideration the interests of innocent ship owners, as well as the interests of cargo owners and the underwriters who insure the vast majority of cargoes carried by sea for compensation which they deem adequate for the risks. The language of the statute implies the intention of Congress, on the one hand, to exact the highest diligence on the part of ship owners to provide vessels in all respects seaworthy and properly equipped, supplied, and manned, and, on the other hand, when they have exercised it to relieve them from the consequences of the faults of those over whom, as their business is usually conducted, they have no immediate control, and to whom they must commit the navigation and management of their vessels. The statute does not discriminate between gross faults and trivial faults, and when a loss has been caused by a fault of navigation or management of the vessel, and the ship owner has fully performed his obligation, it is the meaning of the statute that he shall not be liable.

For the loss accruing to that part of the cargo which was not carried by the Germanic from Liverpool, but was put on board at New York late on Monday afternoon and shortly before she sank, I think the libelants are entitled to recover. When it was taken on board the vessel was not in a seaworthy condition. Crippled with ice, unstable, and with an exposed port hole, she was not in a condition to carry cargo safely.

I am therefore of the opinion that the decree of the court belov should not be affirmed, but should be modified.