## THE SAMLAND.

(District Court, S. D. New York. July 8, 1925.)

1. **Shipping ⬅⟹132(3)—Ship must show damage to shipment was from cause excusing it.**

Ship has burden of showing that damage by freezing to shipment, received in good order, and to be delivered in like good order and condition, was occasioned by cause for which it was not liable.

2. **Shipping ⬅⟹132(5)—Ship held to have failed to show freezing in refrigerator compartments not due to negligence of those charged with control of temperatures.**

That damage by freezing to shipment stowed in some of ship's separate refrigerator compartments was not caused by inattention and neglect of those charged with responsibility of controlling temperatures therein *held*, under the evidence, not shown.

3. **Shipping ⬅⟹137—Negligence in control of temperatures in refrigerator compartments not as to management of vessel excused by Harter Act.**

Negligent failure to observe condition of thermometers for recording temperatures in refrigerator compartments, and so to control temperatures therein, resulting in freezing of shipment, was not a fault in the management of the vessel, for which ship is excused by Harter Act, § 3 (Comp. St. § 8031), but negligence in not properly caring for the cargo, for which it is liable.

In admiralty by Van Dyk & Lindsay, Inc., against the Steamship Samland, Societe Anonyme de Navigation Belge Americaine, claimant, to recover damages for shipment of endives and grapes caused by defective refrigeration during voyage from Antwerp to New York. Decree for libelant.

Wood, Cooke & Seitz, of New York City, for libelant.

Burlingham, Veeder, Masten & Fearey, of New York City (Ralph W. Brown, of New York City, of counsel), for claimant.

THACHER, District Judge. [1] The shipment in question, consisting of 160 packages of grapes and 348 baskets of endive, was received in good order on board the vessel, to be delivered in like good order and condition at the Port of New York. Upon delivery in New York the merchandise was found to have been damaged by freezing during the course of the voyage. Under these circumstances the burden was upon the claimant to show that the damage was occasioned by a cause for which it was not responsible. The Folmina, 212 U. S. 354, 29 S. Ct. 363, 53 L. Ed. 546, 15 Ann. Cas. 748; Andean Trading Co. v. Pacific Steam Navigation Co. (C. C. A.) 263 F. 559. This burden the claimant attempts to meet by proof that the owner exercised due diligence to make the ship and her equipment in all respects seaworthy, that the damage was not caused by any negligence in stowing or caring for the shipment, and that, if there was any negligence in the operation of the refrigerating plant, that was a fault or error in the management of the vessel for which the owner and the ship are not responsible under section 3 of the Harter Act (Comp. St. § 8031).

[2] When the merchandise was taken on board it was properly and carefully stowed in the refrigerating compartments on board the ship. Such merchandise is customarily carried under refrigeration, and higher rates are charged for such carriage than for

ordinary cargo. Temperatures reasonably safe for the carriage of such merchandise range between 36 and 40 degrees Fahrenheit. If the grapes or the endive are allowed to freeze, serious damage is inevitable. It appears from the evidence that there were on the Samland five separate refrigerating compartments, two of which were used exclusively for carrying the ship's provisions, and the remaining three for cargo. Portions of the shipment in question were stowed in all three of the refrigerating compartments used for cargo. The refrigerating compartments are artificially cooled by the circulation of brine through pipes running along the walls and ceilings of the compartments; this brine being pumped through separate pipes leading to each compartment, after having been subjected to a refrigerating process, which can be controlled by stopping the process of refrigeration or by increasing or retarding its intensity through the mechanical control of pressures. In each compartment there is a hole or pipe through which a thermometer attached to the end of a screw cap is inserted and securely held in place, so that, in order to read the temperature in any one of the compartments at any time, it is only necessary to unscrew the cap and withdraw the thermometer. Although the record is not as clear as it might be upon the point, I am satisfied, from the recorded average temperatures in the separate compartments, that it was quite possible to raise and lower the temperature in one or more compartments without substantially affecting the temperatures in the others, no doubt by allowing the warm air to enter one compartment.

It is the contention of the claimant that when the ship was about 11 days out from Antwerp the temperatures registered on these two thermometers were found to be too high, and, when the refrigerating machinery was so operated as to reduce the temperatures, these thermometers failed to record any reduction, and that on the morning of the following day, at about 9 o'clock, the chief engineer, regarding this condition as suspicious, had the compartments opened and discovered that, although the thermometers registered temperatures of about 40 degrees Fahrenheit, the actual temperature within the compartments was 25 degrees Fahrenheit. Heavy frost had formed on the pipes, and the merchandise was removed from the compartments so as to permit the removal of this frost, and then put back;

new thermometers being installed in place of the old ones. That the damage resulted from the failure to properly control the temperature in the compartments is clearly established, and the serious question is whether this was due solely to a latent defect in the two thermometers, or to the negligence of those in control of the refrigerating machinery.

It appears from the testimony of the chief engineer that readings from these thermometers were made during each watch by the assistant engineers and entered on the log; that during the day it was his duty to make entries on the abstract engineer's log of the average temperatures for the day, averaging those reported on the log for each watch. The log upon which the original entries were made was not produced, it appearing, however, from counsel's statement that it could not be found, although diligent search had been made; nor were any of the assistant engineers who made and entered the readings on the original log produced as witnesses, it also appearing that none of them were available. The chief engineer was called as a witness, and produced the abstract engineer's log kept and signed by himself during the course of the voyage. From this it appears that the average temperature recorded on the thermometer in compartment No. 5 was 39 degrees Fahrenheit on March 15th, 40 degrees Fahrenheit on March 16th, and 29 degrees Fahrenheit on March 17th, the day on which the discovery was made, and that the average temperatures reported in compartment No. 6 were 38 degrees Fahrenheit on March 15th, 38 degrees on March 16th, and 29 degrees on March 17th. There is no proof to indicate how these readings varied during the course of each of these three days. This would have been clearly disclosed by the log, which has not been produced. If, as contended by the claimant, the defect in the thermometers was discovered through their failure to react to increased pressures, which should have immediately lowered the temperatures within the compartments, it was of the utmost importance to show when the pressures were first increased and the failure of the thermometers to respond first discovered, for, upon such discovery, the defect ceased to be latent and became patently obvious, requiring prompt action in order to prevent freezing. The abstract of the engineer's log shows that for the whole day on the 16th the temperature in compartment No. 5 averaged 40 degrees, which was a fact necessitat-

ing an increase in pressure in order to reduce the temperatures. What, if anything, was done on the 16th, in the face of this situation, is not disclosed, because no one with any knowledge of the facts was called to testify.

I am unable to accept the testimony of the chief engineer that the temperature was first recorded at 40 degrees Fahrenheit on the 12 to 4 a. m. watch on March 17th, in the face of the entries on the abstract engineer's log kept by him, showing an average temperature for the entire day on March 16th of 40 degrees in compartment No. 5 and a very largely increased pressure recorded on the condenser gauge during that day. These entries clearly indicate that the occurrence which he had in mind happened, not in the early morning hours of March 17th, but on March 16th, for it appears that the temperature was recorded at an average of 40 degrees on that day, and that the pressure required to lower the temperature in the compartments was very largely increased on that day. Nothing was done about the matter until about 9 o'clock on the morning of the 17th. It is therefore fair to conclude that during March 16th the temperature recorded was excessive; that efforts were made on that day to reduce the temperature without any result being indicated on the two thermometers in question; that this called for immediate investigation; and that, if investigation had been made, the trouble could have been promptly discovered and corrected.

The burden imposed upon the claimant is not met by proof that the damage may have resulted from a cause for which he is not responsible. On the contrary, he must affirmatively show what caused the damage, and that the cause is one for which he is not responsible. The Folmina, supra. If forced to reach a conclusion upon the record in this case, I am inclined to believe that it would be necessary to decide that the damage to the goods resulted from inattention and neglect on the part of those charged with the responsibility of controlling the temperatures in the refrigerating compartments in which the endive and grapes were stowed. It is not necessary to go so far, in view of the burden which is imposed upon the claimant. Certainly the claimant has failed to show that the damage was not caused by such inattention and neglect.

[3] It is, however, insisted that, if there was negligence in the management of the refrigerating apparatus, this was a fault or error in the management of the vessel, for which the vessel cannot be held responsible under the third section of the Harter Act. The particular fault or error which directly resulted in the damage for which the vessel is sought to be held responsible was the failure to observe the condition of the thermometers used for recording the temperatures in compartments 5 and 6. No ship supplies were stored in either of these compartments. So far as appears, there was no trouble in any of the other three compartments, two of which were used for preserving the ship's supplies. The record of temperatures in the individual compartments shown on the abstract engineer's log clearly indicates that these separate compartments must have been under individual control, and the fault or neglect complained of was not one which in any way affected the preservation or care of the ship's supplies. As the results indicate, the failure to observe the temperatures in the compartments where the grapes and endive were stowed related primarily to the preservation of the cargo. Had the fault or neglect been shown to have affected the entire refrigerating apparatus, which was being used not only for the preservation of cargo, but also in the operation of the ship, in the sense that it was being used for the preservation of her necessary supplies, the case would be on all fours with the decision of the English Court of Appeal in Rowson v. Atlantic Transport Co., Ltd., [1903] K. B. Div. 666. This case, however, was not followed by Judge Dietrich in the Jean Bart (D. C.) 197 F. 1002, and the Circuit Court of Appeals in this Circuit, in Andean Trading Co. v. Pacific Steam Navigation Co., 263 F. 559, has expressly approved and followed Judge Dietrich's decision. It is clearly established that section 3 of the Harter Act is limited in its application to faults "primarily connected with the navigation or the management of the vessel, and not with the cargo." Knott v. Botany Mills, 179 U. S. 69, 21 S. Ct. 30, 45 L. Ed. 90; The Germanic, 124 F. 1, 59 C. C. A. 521; Id., 196 U. S. 589, 25 S. Ct. 317, 49 L. Ed. 610; Andean Trading Co. v. Pacific Steam Navigation Co., supra; The Jean Bart (D. C.) 197 F. 1002.

It appears that the refrigerating apparatus was operating most effectively, and that the only fault and error involved in this case related exclusively to the control of the temperatures in the particular compartments where the grapes and endive were stowed. This being the situation, there can be no doubt that, within the principle of these decisions, the ship and her owners are respon-

sible for negligence in not properly caring for the merchandise in question.

Accordingly, a decree may be entered in favor of the libelant, with provision for the usual reference to determine the damages.