## THE S. S. ASTURIAS.

District Court, S. D. New York.
May 6, 1941.

Bigham, Englar, Jones & Houston, Ezra G. Benedict Fox and Charles W. Harvey, all of New York City, for libelants.

Haight, Griffin, Deming & Gardner, Herbert M. Statt, and David L. Corbin, all of New York City, for claimant.

HULBERT, District Judge.

This is a suit in rem in admiralty to recover cargo damage.

The Norwegian Steamship Asturias arrived at the Port of New York on February 22, 1938 from Brazil, after a voyage of twenty days with a cargo of 36,500 bags of cocoa beans and 69 bales of wax.

It was stipulated at the trial that the libelants were the holders for value of seven bills of lading covering 18,000 bags of these cocoa beans, out of which libelants claim 1,171 bags were wet in transit, and the contents, to some extent, were damaged by moisture. Those bags were opened and the damaged cocoa beans, weighing 7,912 pounds, were skimmed off and destroyed, in accordance with the Regulations of the United States Department of Agriculture.

The cargo was loaded at two Brazilian Ports; four of the seven shipments in question, commencing on January 17, 1938 at Illheos, from whence the vessel sailed January 31st, arriving at Bahia on February 1st, where the remaining three shipments of cocoa beans in question were taken on board.

The libel alleges delivery to the carrier in good order and condition, and out-turn at New York in a damaged condition "by reason of contact with water."

In answer to claimant's interrogatories, libelants state that the damage was caused "by reason of contact with sea water and/or fresh water which presumably entered the vessel's holds during the course of the voyage."

The claimant, disclaiming liability under an exception in the bills of lading and exemption under the Harter Act, Title 46, U. S.C.A. §§ 190–195, and the Carriage of Goods by Sea Act, Title 46 U.S.C.A. §§ 1300–1315, contends that it is relieved from liability because the damage resulted from sweat occasioned by perils of the sea.

The Carriage of Goods by Sea Act applies and governs the disposition of this case.

The purpose of the Act is to create international uniformity. It is a counterpart of the British Carriage of Goods by Sea Act, 1924, and the Barbadoes Carriage of Goods by Sea Act of 1926, an illuminating consideration of which is to be found in the case of The Lady Drake (Super.Ct.Dist. of Montreal) 1935 A.M.C. 427; Id. (Court of King's Bench in Appeal, Dist. of Montreal) 1936 A.M.C. 998; Id. (Dominion of Canada, Supreme Court) 1937 A.M.C. 290.

These cases were reviewed by Judge Tuttle in Spencer Kellogg & Sons, Inc., v. Great Lakes Transit Corp., D.C.E.D. Mich. S.D., 32 F.Supp. 520.

Section 1304(2) of the Act enumerates seventeen clauses of exemption from liability. These provisions, so far as pertinent, are:

"(a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship;

\* \* \* \* \*

"(c) Perils, dangers, and accidents of the sea or other navigable waters;

\* \* \* \* \*

"(m) Wastage in bulk or weight or any other loss or damage arising from inherent defect, quality, or vice of the goods;

\* \* \* \* \*

"(q) Any other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier, but the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage."

The shipper has the burden of proof under subdivisions (a) to (p), and the burden is on the carrier as to subdivision (q).

It is to be noted that sweat is not specifically included in the classifications from (a) to (p), inclusive, and I hold, therefore, that the ship is not relieved of liability of sweat damage per se, but if under subdivision (q) it can be shown that sweat damage results from perils of the sea, it would constitute a complete defense.

My interpretation, with respect to sweat damage, is based upon subsection (8) of Section 1303 which makes the exception contained in the bill of lading null and void and of no effect, as was held in the Lady Drake case, supra, with respect to a similar exception as to breakage.

It becomes, therefore, necessary to analyze the proof.

The Asturias is a steamer of convention "three-island" type, built in Norway in 1912. She has a forward and aft hold, each approximately 100 feet long by 42 feet broad and 20 feet deep, with four hatches, two to each hold; no 'tween decks, but the bridge deck space was used for stowage. The forward hatch was 20 feet by 18 feet and the after hatch was 31 feet by 18 feet, and each was equipped with three or four rows of wooden hatch covers running fore and aft over which tarpaulins were placed for additional protection from water. There were eight ventilators, four to each hold, the two forward ventilators in the forward hold being of the ordinary cowl type, about 2 feet in diameter. At the after end of the forward hold there were two kingpost ventilators about 18 inches square which extended to a heighth of 30 feet above the deck; over these kingpost ventilators, as a protection from the weather, were metal plates which were fastened at a distance of about 3 to 4 inches above the top of the ventilator opening; the ventilators in the after hold were of a similar type, except that the kingposts were forward and the cowl ventilators were aft. The kingposts are not equivalent to the cowl ventilators but functioned primarily as exhausts rather than intakes. Nevertheless, when the vessel was running into the wind the kingposts would draw in and the ventilators on the forecastle, when trimmed off the wind, would let the air out. There were no ventilators in the bridge space but it could be ventilated at the hatches and by the doors at the forward and after end of the space. Additional ventilation for the forward and after holds could be had by unbattening the corners of the tarpaulins, lifting up the hatches and putting a wedge underneath so as to leave a space of 6 or 7 inches.

On January 16, 1938, the Asturias arrived at Illheos from Tenerife, in ballast. On that voyage, in preparation for the receipt of a cargo of cocoa beans, the holds were swept down and cleaned as well as could be done with brushes, then washed down with fresh water. This was done on January 5th and 6th. Before loading the cargo layers of dunnage were placed on the bottom of the vessel crosswise, thwartships. There were no clips for the usual battens, and it was necessary to erect uprights about 2 by 4 or 6 inches which ran about 2 feet apart from the deck down to the bilges to set up dunnage on the sides and keep the bags of cocoa beans out of contact with the skin of the ship. These dunnage boards, about an inch thick, were placed upon uprights and ran fore and aft and were nailed to the uprights about 18 inches apart to keep them in place.

The side bilges were covered with lumber board and at the forward end of the hold, that is, at the after side of the forepeak and the after side of the engine room space, dunnage was provided in the same manner as on the sides, but ran thwartships.

In addition to the wooden protection, straw mats were placed on the bottom, on the sides, and fore and aft of each hold and on top of the cargo, at least under the hatches and kingposts. In the aft hold there is a tunnel and uprights and dunnage and mats were provided to keep the cargo away from it; similar methods were followed to protect the cargo placed in the bridge deck space.

On January 17, 1938, the loading of the cargo was commenced and was concluded on January 24th. Loading at Illheos was from pier to ship. The bags had to be carried about 200 yards from shed to wharf. Loading was stopped during light showers, and on January 22d entirely suspended, and the hatches closed because of rain. On January 24th the vessel was shifted to another pier and waited until January 31st for flood high water. Crossing the bar, according to an excerpt from the log book in evidence, she struck the bottom quite heavily several times but after repeated soundings of the bilges and tanks, the ship was found to be completely tight.

Arriving at Bahia on February 1st, additional cocoa beans were loaded, without interference of rain, until she had a full cargo, and the next day the vessel was on her way to New York.

The cocoa bags were stowed to within 6 inches of the deck beams (or within a foot under the deck), that is, 22 tiers of bags high, and at each of the four corners of each hatch a vertical aisle or space was left open in the stow from top to bottom, the size of the opening being about 2 feet square; sixteen such aisles or spaces were

left open in all to allow hot air generated in the base of the stow an opportunity to escape.

The stowage was under the direction of the Chief Officer who was making his first voyage to this side of the Atlantic and had had no previous experience with cocoa beans.

On January 28th and 29th, the tarpaulins over the hatches were folded back over the center hatch board and the side hatch covers were removed to ventilate the cargo, but the hatches were closed and battened down on the trip from Illheos to Bahia because of the expectancy of rough weather.

Leaving Bahia (February 2, 1938) the vents were open as they had been from the beginning. Canvas hoods were provided for use in bad weather but the vents were only covered on two occasions, February 11th and February 20th. The log book showed an incomplete record of the hatch ventilation but according to the Chief Officer, additional ventilation was provided by unbattening the corners of the tarpaulins and lifting up the hatch covers and putting a wedge underneath so as to leave a space of 6 or 7 inches.

From the morning of February 5th to February 11th, there was rain or showers; the tarpaulins over the hatches hung loose. On February 11th the hatches were battened down and all doors to the bridge deck space were locked due to a blow-up to the northeast, and they so remained until the morning of February 16th, when they were all opened up.

The ship's log shows:
Feb. 11th: "Heavy sea, shipping much water".
Feb. 12th: "Heavy Northerly swell, shipping water on the fore deck and amidship".
Feb. 13th: "Much water on deck".
Feb. 14th: "Shipping water forward deck and amidships."
Feb. 15th: "Wind force 5–4, lightly cloudy, sea 4–3".

The hatches were battened down again on the afternoon of February 16th and so remained until the morning of the 19th. The ship's log shows:
Feb. 17th: "Shipping much water".
Feb. 18th: "Wind force 5–3, cloudy, sea 4,".

The hatches were closed again in the afternoon of the 19th, but not battened down; they were battened down on the 20th (off Hatteras) when the wind force reached 9 on the Beaufort Scale, and remained battened down until the discharge of the cargo, beginning on February 24th. The ship's log shows:
Feb. 20th: "Day commences with spray over the forward ship; At night, shipping heavy breakers over forecastle head, forward deck and amidships."
Feb. 21st: "Wind force 8–4, sea 7–5, shipping heavy breakers over the forecastle head."
Feb. 22nd: "Wind force 4, clear, sea 3."

While asserting that rough seas were encountered, the Chief Officer said they were not extraordinary or different from what might be expected, judging by his experience on some 15 later voyages, especially off Cape Hatteras, and no structural damage had been sustained by the vessel. He further testified: "We got a special letter for taking on board this cargo, to be careful with it and ventilate it as much as possible." He took the temperature of the air, but not of the water or the holds, although he stated that while he could not get into the holds, he could look in, and there was no sweat before the last time the hatches were battened down.

Tore Eidbo Hansen was the only officer who testified on behalf of the vessel. As soon as the hatches were opened in New York he discovered the cargo had sustained damage. He and the Superintendent for the Pan American Line (to whom the vessel was under charter), but not called as a witness, supervised the hatches during the discharge of the cargo.

According to the Chief Officer, all around the hatch coaming was very wet from sweat. Underneath the hatch coaming, and particularly underneath the kingposts, underneath the ventilators, in the air spaces at the corner of the hatches, water dripped down from the hatch coamings and just touched the corners of the bags. The coamings themselves were wet the last day in the cold weather up along the Coast, and when the ship arrived in New York, they started to get wet inside and drip. There was no sweat at all in the bridge deck space. He observed the discharge of the cargo as it went on and aside from the places spoken of it was all dry. When they got down to the floor of the hold, or the ceiling, speaking nautically, it was all dry; likewise the bags.

He estimated that 300 or 400 bags were wet with moisture which came from around the hatch coamings and underneath the kingposts, especially in the forward hold. They did not examine any of these bags after they were discharged on the dock. There were mats over the tops of these bags but it was "so condensing in the kingposts" that it was too much for the mats to absorb it; they were soaked with water which had gone down nearly to the bottom.

Segur K. Lynner, a cargo surveyor, called as a witness on behalf of the claimant, testified that he had gone on board the Asturias on February 23d, when, he said, he had the hatches opened up sufficient to make an examination of the top of the stow in all of the hatches, and that he was there again on February 25th.

It is apparent that Captain Lynner was in error in his dates because the log shows the entry for February 23d: "Rained all day, no discharging", and the Chief Officer testified the hatches were not opened until the morning of the 24th, and after the discharging had proceeded for an hour or two, it was suspended for the fumigation of the vessel.

However, Captain Lynner testified that he was present every day during the course of the discharge of the cargo and observed sweat ·underneath the deck beams, hatch coamings, and all over the top of the cargo. After a sufficient amount of cargo had been discharged to make an inspection possible, he observed heavy sweat under the ventilators. The damaged bags, he said, were all from the top of the stow, except where the sweat had penetrated down the air shafts built in the stow, underneath the hatch coamings. He saw the sweat dripping from the deck beams down onto the bags.

Cecil George Elliott, a cargo surveyor, called as a witness for the libelants, first examined the cargo on the pier on March 7, 1938, 12 days after it had been discharged from the vessel. He testified that he tested 14 samples of the stained bagging by the silver nitrate test which consists of placing the samples in test tubes containing water and adding drops of silver nitrate.

The formation of a white "curdy" precipitate indicates the presence of an appreciable amount of chlorine compounds ·and the test is considered "positive." A "decided white opalescence" is taken to indicate the presence of chlorine compounds and is also considered "positive." A clear solution or a faint white opalescence is disregarded and the test is reported "negative." Of the 14 tests made by Mr. Elliott, 5 produced definite salt reactions, 5 slight salt reactions, two traces of salt, and no such reactions in the remaining two tests. The five definite reactions he attributed to "contact with sea water in some volume" although none of these tests produced a "curdy" condition; the five slight reactions he attributed to "either sea water or ship's sweat."

He used tap water in making his tests, admitting that it would have been better to have used distilled water and conceded the accuracy of the statement that "If distilled water is not available, precautions must be taken to see that the water used is free from chlorides. Some drinking waters contain sufficient chlorides to upset chemical tests of this nature," but the two negative tests made by him indicate that the water he used did not of itself produce a chloride reaction.

Captain Lynner, having a much more extended experience than Mr Elliott, also made silver nitrate tests on about 34 bags taken from the ship, using distilled water. He was unable to further identify the part of the vessel from which these bags came. In a few samples the reaction was positive, in others a very slight reaction was produced, and from the balance, no reaction resulted.

In his opinion, the resultant damage was due to sweat as no sea water could have entered except through the ventilators.

The testimony of the Chief Officer as to the care exercised to protect the hatches in heavy seas or rain is not convincing. He testified from recollection when there was an absence of a record in the log book.

It is not plausible that the damage from sea water resulted alone from the spray which may have entered through the kingposts, and Captain Lynner opined that the salt from the spray accumulating in the kingposts was carried down into the hold by the sweat created when the hot air, seeking an outlet from the bowels of the vessel, condensed in the kingposts. This is mere theory. See The Lassell, D.C., 53 F.2d 687, 688.

There is, of course, evidence of sweat and some of the damage undoubtedly resulted therefrom.

The Chief Officer said it was the opinion of the Captain, as well as his own, that the ventilators were insufficient and for that

reason the hatches were opened and the wedges used.

Captain Lynner disagreed with this statement, stating that the ship was ventilated as most ships in general cargo trade and that the hatches were opened up, not because the ship had insufficient ventilation, but because the ship's officers had been directed to give particular attention to the ventilation. Captain Lynner further testified that a cargo of cocoa beans has a tendency to heat if not properly ventilated because it contains a lot of moisture and is a soft bean, and there are a number of other cargoes which have a similar tendency,—green rice is probably the worst, and then "I think cocoa comes a good second."

What is known as rice ventilators [1] have been used for some time, and that use has been extended to other cargoes, including fish-meal, since 1934 or 1935.

Captain Lynner said that in a cargo liable to heat, the chances of sweat are increased but there would be no good purpose whatsoever for using the system of rice ventilation because there is no danger of spontaneous combustion in a cargo of cocoa beans. Yet, on redirect examination, he stated rice ventilators are not used exclusively in cargoes that are subject to spontaneous combustion, because "you are not going to have spontaneous combustion with green rice." Again, "You have heating and you will have moulding of the rice, and that is why they use them there; but you have not got that in cocoa."

He further stated that rice ventilators would not have prevented the sweat in this case "because it is solely a surface condition of the cargo. There is no danger down below in the cargo. It is only the air on top of the cargo, and rice ventilators would not help anything in regard to it."

Captain Lynner's attention was drawn to a paper which he had prepared for the benefit of ship owners some 20 years ago in which he said:

"The principal causes of damage to cargo are sweat and heat, both of which may be reduced to a considerable degree by proper attention to ventilation.

"Certain commodities, such as rice, cocoa beans, bone meal, all fertilizers, fruits, nuts, and so forth, generate heat which will ordinarily cause sweat. This sweat reacting on these commodities will cause more heat to be generated, causing more sweat.

"The two principal remedies for sweating and heating are dunnage and ventilation.

"Matting is only used to prevent direct contact of cargo with pillars, angles, and so forth, which might stain by rust. Matting should not be used where sweat may gather, as in such places it is more likely to cause damage than to have any beneficial effect. It will both prevent the circulation of air and also transmit moisture. Matting should never be used to protect against moisture."

He further testified that "the bags were stained by drippings from overhead; there was no damage to the beans at the time"; he did not know the intended function of the mats, but expressed the opinion that "they are fine to keep your cargo clean, but no other purpose there. Now, there are other schools that think it is a good thing to use them together with dunnage. I don't."

Captain Lynner's testimony evinces to me a disposition, as I stated of the crew of The Maria, D.C., 15 F.Supp. 745, page 751, "to 'stick to the ship.' "

Quite apart from the Carriage of Goods by Sea Act, it is the duty of the carrier under the General Maritime Law, when the cargo is not delivered in the like order as received, to show affirmatively that the damage arose from an excepted peril. The Rosalia, 2 Cir., 264 F. 285.

The Asturias encountered rough weather and high seas, not, however, unusual for the season of the year on that route. No structural damage was sustained by the vessel. Mere proof of damage to cargo by sea water is insufficient. The G. R. Booth, 171 U.S. 450, 19 S.Ct. 9, 43 L.Ed. 234. The efficient cause must be sought in those conditions or events which account for the entrance of sea water. The Folmina, 212 U.S. 354, 29 S.Ct. 363, 53 L. Ed. 546, 15 Ann.Cas. 748. Since that case, the court was unable to determine the cause of the entrance of the sea water into the vessel, the doubt was resolved against the carrier. The Edwin I. Morrison, 153 U.S. 199, 212, 14 S.Ct. 823, 38 L.Ed. 688. The presence of the sea water, and the heat resulting from insufficient ventilation, contributed to produce the sweat, and hence both sea water and sweat damaged the cargo. If the claimant were liable for one and not the other, upon the proof—or lack of it—under the ruling in The Vallescura,

---

[1] Thomas on Stowage 334.

293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373, the carrier would bear the entire loss.

Section 1303 of Title 46 U.S.C.A. provides:

"(1) The carrier shall be bound, before and at the beginning of the voyage, to exercise due diligence to—

"(a) Make the ship sea worthy;

"(b) Properly man, equip, and supply the ship;

"(c) Make the holds, refrigerating and cooling chambers, and all other parts of the ship in which goods are carried, fit and safe for their reception, carriage, and preservation.

"(2). The carrier shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried."

The obligation of the carrier is not limited merely to the careful stowage of the cargo, but also to "keep, care for, and discharge the goods carried" and if a cargo shipped in good condition is delivered damaged in a manner preventible by reasonable precaution, the burden to show exemption from liability rests upon the carrier. Section 1304 (q), supra.

Bache v. Silver Line, Ltd., 2 Cir., 110 F.2d 60, has not escaped my consideration, but I feel that case has no application since it appears:

1. That the vessel was insufficiently ventilated;

2. That the shipper had made a special request with respect to ventilation;

3. That the Chief Officer had had no previous experience in the care of a cargo of cocoa beans; and

4. The evidence fails to satisfy me that the hatches and ventilators were properly attended.

The latter is not a matter of ship's management but the care of the cargo. Andean Trading Co. v. Pacific Steam Navigation Co., 2 Cir., 263 F. 559; Barr v. International Mercantile Marine Co., 2 Cir., 29 F.2d 26. Those on board the vessel are in a position to know better the existing conditions than the owner of the cargo.

My conclusion, upon the evidence, is that the cargo damage did not result from perils of the sea and that the claimant has not discharged the burden of establishing that its actual fault or privity or neglect of its agents or servants did not contribute to the loss sustained.

There will be an interlocutory decree for the libelants with the usual reference, unless the parties agree upon the amount of damage.