## THE HUDSON.

### (District Court. S. D. New York. October 4, 1909.)

SHIPPING (§ 141*)—CARRIAGE OF GOODS—INJURY TO CARGO.

> Damage to goat skins, a part of cargo on voyage from Shanghai to New York. *Held* that the ship was not liable, as the evidence showed that the damage was due to sweat and spray.
>
> [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 493, 497–499; Dec. Dig. § 141.*
>
> Loss by perils of the sea, see notes to The Dunbritton, 19 C. C. A. 465; Southern-Innes Co., Ltd., v. Thynas, 64 C. C. A. 118.]

(Syllabus by the Judge.)

In Admiralty. Action by the Surpass Leather Company against the steamship Hudson. Libel dismissed.

Kneeland & Harison, for libellant.
Convers & Kirlin, for the Hudson.

ADAMS, District Judge. The Surpass Leather Company shipped at Shanghai in February, 1907, on the steamer Hudson, in good order, some 316 bales of untanned goat skins for delivery in New York. Bills of lading were duly issued, acknowledging the receipt of the skins in good order. When the steamer reached her destination in May, 1907, it was found that some 63 of the bales containing the skins were in a wet and damaged condition, whereby the libellant has suffered damages to the extent of $10,000. The libel alleged that the damage was not caused by sea peril, or any peril excepted to in the bills of lading, but was due to the unfit and defective condition of the steamer or to fault in the loading, stowage, custody or care of said cargo.

The claimant of the steamer, after some admissions and denials, alleged:

"Seventh: Further answering and as a separate defence herein, the claimant alleges that the bills of lading under which the skins referred to were carried, stated that they were shipped in apparent good order and condition, and that the weights, quality and contents were unknown. They provided that the Steamship should be exempted from liability for loss or damage arising from heat, insufficient packing or reasonable wear and tear of packages, sweat, decay, vermin, rain, spray, effects of climate, putrefaction, evaporation, heat of the holds, change of character, inherent quality or vice of the goods shipped, and land damage.

The claimant avers that the Steamship Hudson, her owners, master and officers, duly performed all the duties and obligations imposed on her by the bills of lading which constitute the contract of carriage in this case and that if there was any damage, as is alleged in the libel, which is not conceded it was within the exemptions of the contract and was due to sweat and to heat of holds and to other causes within the exemptions, and was not caused by or contributed to in any manner by any fault or neglect on the part of the Steamship Hudson, her owners, master, officers or crew, or any one for whom the Steamship Hudson or her owners, may have been responsible.

Eighth: Further answering, the claimant alleges that at all the times hereinbefore recited, the Steamship Hudson was engaged in transporting merchandise to a port in the United States of America and that her owners exercised due diligence to make her in all respects properly manned, equipped and supplied and that, accordingly, under the terms and provisions of the Act of

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Congress, approved February 13th, 1893, entitled 'An Act relating to the Navigation of vessels,' etc., the said vessel and her owners are not to be held responsible for any damage which may have occurred in the manner alleged in the libel."

The libellant claims that this wetness was due to salt water, while the claimant contends that it was caused by sweat or spray, which were causes of damage covered by the bill of lading exceptions.

It appears that the skins were stowed in the No. 2 between decks of the steamer, which was a compartment about 100 feet long from the forward iron bulkhead. At a point about 38 feet forward of the engine room bulkhead, a wooden bulkhead had been erected, about 4 years previously, for the purpose of forming a reserved coal bunker, which had been used at times for coal and at other times for general cargo. There were doors in this bulkhead about 7 feet high by 6 feet wide, one on each side, which when cargo was carried in the place were taken down and laid on the deck. In the after part of this reserved space at the outer sides of the deck and about 2 feet forward of the engine room bulkhead was a 1½ inch scupper on each side, with a grating on top, leading to the bilges. There were openings in the wooden bulkhead at the deck on each side to permit the flow of water to the scuppers. These scuppers were the only means provided for draining the entire No. 2 between decks. The wooden bulkhead which formed the reserve bunker was almost directly under the bridge bulkhtad and about 2 feet aft of the after coaming of No. 2 hold. It was on the floor of this reserve bunker space that the skins in question were stowed.

Between the after coaming of the No. 2 hatch and the bridge bulkhead a ventilator was situated, a little on the starboard side of the center of the vessel. The tube of this ventilator extended from 18 inches to 2 feet above the deck, the hatch coaming being of the same height and the bridge bulkhead much higher. This ventilator, therefore, stood in a narrow channel between the hatch coaming and the bridge bulkhead and the officers of the vessel testified that any water coming on board would necessarily rush back and forth through this narrow space.

The bales of skins were stowed on dunnage consisting of sticks of bamboo laid fore and aft and athwartship and of double matting laid over the bamboo. The damage found at New York was particularly noticeable on the sides and bottoms of the bales. It was described by one of the libellant's witnesses as "positively rotten" and by another as "decomposed, rotten."

The question to be determined is whether the damage was due to some fault on the part of the ship or was within the duly excepted clauses of the bill of lading, which included sweat and spray.

The passage was a stormy one, especially in the Mediterranean and Atlantic Ocean. The ventilators were kept open whenever practicable but the weather necessitated keeping them hooded for about half the time.

The preponderance of the testimony shows that the damage was due to fresh not salt water. The libellant's witnesses seemed to think otherwise but were not positive and admitted that the damage might

have been done by sweat. These witnesses did not test the water and the claimant's witness Meikle placed the burlap surrounding the damaged bales in his mouth and tasted it and found that the taste was fresh. This was also found to be the case by other persons who tasted it. The claim therefore that the damage was due to sea water must fail. Possibly there was some slight damage from spray during the voyage but that was covered by an exception.

The skins were stowed in a proper place and were duly ventilated. No fault can be found with the vessel in these respects.

It is alleged that the scuppers of the between decks were insufficient and that the damage was attributable to such cause or to some stoppage of the scuppers prior to her sailing from the East.

The vessel was built under a special survey of Lloyds and was under the supervision of a Lloyds representative during the period of construction. She was rated in the highest class and the testimony shows that the number of scuppers had never been found insufficient on previous voyages. The libellant's witness, Wilkinson, testified that the scuppers were sufficient to deal with any water in the space affected. There can be no doubt that at the beginning of the voyage the scuppers were open and in good condition. The libellant's witnesses said that they found them closed a short time subsequent to the ship's arrival here but this should doubtless be attributed to exposure to the dust and cinders incident to rebunkering in New York. There is no satisfactory evidence to show that the scuppers were clogged when the ship first came into port. She arrived April 23rd and was at her berth April 25th. The libellant's witnesses did not examine the compartment until May 1st or subsequent thereto. The ship's officers examined it but found no water standing over the scuppers but on the contrary found them clear except for a few pieces of matting and some "washing stuff" on top, which one of them scraped off with his knife. This officer found the scuppers clear and upon opening up of the limbers, saw the water come down. This rubbish was probably washed from the deck through a ventilator hole opened up after the cargo was taken out. If, however, the scuppers were clogged during the voyage, there is nothing to show that the master and crew were negligent in allowing them to become so. They would not have access to them during the voyage and the dunnage and materials used were of the usual kind, such as would not be expected to clog scuppers.

The damage to the skins, which was due to sweat and spray, as above indicated, is explainable by the climatic conditions encountered during the voyage, which began in February at Shanghai, where the weather was very cold. Thence the vessel proceeded to Singapore in a tropical latitude. From there, she again came into cold weather, striking the North Atlantic in the early part of April. In coming from the Indian Ocean, she met with sudden and great changes of temperature, conducive to the sweating of hold and cargo. The testimony shows that under the conditions prevailing, sweat is often produced in sufficient quantities to run along the deck and to accumulate to the extent of 2 or 3 inches in a single night. It should be remembered that it frequently became necessary to keep the ventilators closed.

If there was any negligence in the management of the ship on the

voyage in failing to cover the ventilators, or remove them and stop the tubes in rough weather, or in failing to keep the scuppers clear, the owner is exempted from liability by the Harter Act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946]), having used due diligence to make the ship seaworthy at the outset of the voyage.

The libel is dismissed.