BROWN & WILLIAMSON TOBACCO CORPORATION, Libellant,

and

Liggett & Myers Tobacco Company, R. J. Reynolds Tobacco Company, The American Tobacco Company, and A. Fantis, Intervening Libellants,

v.

THE S.S. ANGHYRA, her engines, boilers, etc., and Hellenic Lines, Limited, Respondents,

HELLENIC LINES, Limited, Cross-Libellant,

v.

BROWN & WILLIAMSON TOBACCO CORPORATION, Liggett & Myers Tobacco Company, and A. Fantis, Cross-Respondents.

No. 6666.

United States District Court
E. D. Virginia,
Newport News Division.
Dec. 17, 1957.

**739**

Edward S. Ferebee, Norfolk, Va., Bigham, Englar, Jones & Houston, New York City, for intervening libellants and cross-respondents.

Francis N. Crenshaw, Norfolk, Va., Stuart Sprague, New York City, Edward S. Ferebee, Norfolk, Va., John W. R. Zisgen, New York City, of counsel, for libellants.

Seawell, Johnston, McCoy & Winston, Jett, Sykes & Howell, Norfolk, Va., Hill, Betts & Nash, New York City, James E. Freehill, New York City, Leon T. Seawell, R. Arthur Jett, Norfolk, Va., Herbert D. Schedler, New York City, of counsel for respondent, claimant and cross-libellant.

WALTER E. HOFFMAN, District Judge.

With the exception of the claim of one A. Fantis involving a shipment of olive oil in tin containers, this action relates to claims by various tobacco interests alleged to have arisen by reason of shipments from Bulgaria, Turkey, and Greece to Newport News and Norfolk on the S. S. Anghyra during the early part of the year 1941. The claimants contend that the tobacco was in good order and condition when stowed aboard the vessel, but was discharged at the agreed ports of destination in damaged condition, thereby imposing liability on the carrier. Respondent relies, in the main, upon the doctrine of inherent vice as exonerating the carrier under the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1304. The several bills of lading make no notation of apparent exceptions to the condition of the tobacco and, as the term is sometimes used in the trade, all shipments were on "clean" bills of lading

At the time of the outbreak of the war between Greece and Italy on October 28, 1940, when Greece was invaded, the American tobacco interests had substantial investments in Turkish tobacco.[1] The short route via Gibraltar was immediately closed, thus leaving as an alternative a voyage via the Suez Canal, the Red Sea, and around the Cape of Good

Baird, Crenshaw & Lanning, Norfolk, Va., Sprague & Peck, New York City, for libellant and cross-respondents.

---

[1]. The term "Turkish" tobacco includes tobacco grown in Turkey, Greece, Bulgaria, and other nearby countries.

Hope. As the claimants [2] were already committed to take large quantities of tobacco from Bulgaria, Greece, and Turkey, all efforts were directed to release vessels already requisitioned by the Greek government (including the Anghyra) to carry the tobacco via Suez. Two vessels preceded the Anghyra carrying tobacco via Suez, but had not arrived in the United States prior to the sailing of the vessel herein involved. While the ship was at Salonika (also referred to as Thessalonike), Greece, about the middle of December, 1940, and awaiting orders to carry Greek troops, the Greek Ministry of Mercantile Marine released the Anghyra from requisition with instructions to load with tobacco, proceed to the United States, and return with war materials.

In substance the claimants urge (1) that the tobacco was improperly stowed, (2) that the ventilation afforded was inadequate and not in use for a period of approximately 196 hours on certain nights while the vessel was at Port Said, Suez, Port Sudan and Mombassa, when, according to respondent, military blackout regulations were in effect, thus necessitating a shut-down of the dynamo with the result that the ventilator fans were not in operation, (3) that the ship was unseaworthy by reason of a poor quality of bunkers obtained at Bourgas (Bulgaria) and Suez, thereby delaying the progress of the vessel and causing her boiler tubes to become clogged, all of which resulted in her inability to keep up with the convoy and brought about delays, (4) that the vessel was improperly and inadequately manned by an inefficient crew over which the master maintained very little control which, in turn, reflected the inefficiency of the ship's officers, and (5) that the tobacco was not the subject of inherent vice or de-

fect, but was loaded aboard the Anghyra in good condition and outturned in damaged condition upon arrival at the ports of destination.

Turkish tobacco is grown by many small planters scattered throughout the countries mentioned. It is purchased by the tobacco "sellers" from the planters who pack the tobacco into "village bales" after the same goes through a process of sun-curing [3]. The "village bales" are then taken to a warehouse where they are subjected to a process known as "manipulation", which completely destroys the identity of the "village bale". The bales are constantly turned in order to provide proper ventilation, and the "manipulation" process is under the supervision of the ultimate buyer (the tobacco interests), although the seller provides the labor as the completed sale does not take place until delivery is taken at the vessel selected for exporting. It is graded and passes through machinery to remove sand, dust and other foreign substance, after which it is again baled into suitable form for exporting. The rebaling occurs from six to twelve months after curing. Prior to the rebaling it is examined by tobacco technicians who remove the wrappers or "chouls", open the bales in one or more places, and ascertain the condition of the interior by sight, touch and smell. The bales of tobacco are purchased by the tobacco interests from the sellers f. o. b. the ports of shipment which are at varying distances from the warehouses where the crops are manipulated and rebaled. With respect to all tobacco involved in this controversy, it was a part of the 1939 crop which, under normal conditions of curing and fermentation, would be ready for export during the cool months of 1940–41. It is conceded that, with respect to these shipments, no tobacco technician examining

2. The term "claimants" will be used to denote the libellant and intervening libellants interested in tobacco shipments.

3. The process of sun-curing is brought about by the planter who picks his crop and places the tobacco, leaf by leaf, on strings which are hung on wooden poles to dry in the sunlight. The tobacco

is taken into the barn at night or during inclement weather. After this process the tobacco is separated according to size of the leaf, packed into what is known as a "pastal", sold to the tobacco "sellers", weighed, and transported by truck or cart to a dry and ventilated warehouse maintained by the tobacco interests.

the bales ascertained the moisture content contained therein, and all bales were wrapped in burlap and not opened at the time they were loaded on the vessel.

Tobacco undergoes a fermentation period which is a chemical reaction caused by the enzymes appearing in the tobacco acting on organic matter. With reference to this tobacco, the normal period of fermentation for the crop in question would take place during the months of April, May, June or July, 1940; the time varying according to the type and origin of the tobacco. As rapid fermentation may cause overheating and deterioration it is necessary, before and during fermentation, frequently to turn the bales for the purpose of airing. The tobacco in this case was baled in "tonga" form[4] in the shipper's warehouses, and the evidence leads to the conclusion that the bales were tightly compressed, which condition became even more apparent when the bales were stowed aboard the vessel and were subjected to the weight of other bales resting thereon. It is conceded that fermentation is a natural process with Turkish tobacco, and is largely induced by the degree of moisture content, temperature of the bale, environmental temperature, time and the extent of the fermentable material sometimes referred to as substrate factors. In the absence of credible evidence indicating the degree of moisture content, and the extent of fermentable material, the Court is faced with the problem of determining the cause of ultimate damage predicated, in the main, upon the environmental temperature, the length of the contemplated journey, and the testimony of tobacco technicians who examined by hand a fair percentage of the interior of the bales during the period of fermentation and a few weeks prior to shipment.

The Anghyra is a coal-burning vessel constructed in 1923 with a gross tonnage of 2,447 tons and a net registered tonnage of 1,437 tons. She has five lower holds above all of which are 'tween desks; the lower holds being numbered 1, 2, 3, and 4, together with the cross bunker and engine room. The approximate dimensions of the holds with depths measured to the tank tops are as follows:

| Hold No. | Length | Mean Width | Mean Depth | Bale Capacity |
|---|---|---|---|---|
| No. 1 | 55' | 41' | 22' | 41,037 cu. ft. |
| No. 2 | 55'6" | 44' | 20' | 50,643 cu. ft. |
| No. 3 | 51'6" | 44' | 18' | 38,954 cu. ft. |
| No. 4 | 48' | 40' | 20' · | 21,189 cu. ft. |

Each hold has a centerline steel bulkhead running fore and aft practically to the square of the hatch (but not across the square of the hatch), with notches or openings at the top where it crosses each overhead deck beam. These centerline bulkheads divide the holds into port and starboard halves, but do not run athwartships. The various dimensions of the longitudinal bulkheads fore and aft of the square of the hatch are:

| Hold No. | Forward Square of Hatch | Aft Square of Hatch |
|---|---|---|
| No. 1 | 21' | 6' |
| No. 2 | 15' | 15'6" |
| No. 3 | 14' | 12' |
| No. 4 | 10' | 16' |

The hatch squares indicate the following measurements:

| Hatch No. | Length | Width | Height of Coamings |
|---|---|---|---|
| No. 1 | 23'1-¼" | 16' | 2-½' |
| No. 2 | 27'3-½" | 16' | 2-¼' |
| No. 3 | 27'3-½" | 16' | 2-½' |
| No. 4 | 23'1-¼" | 16' | 2-½' |

Before discussing the stowage of the quantities of tobacco and the ventilation afforded, it is proper to consider the ship's movements, prior and subsequent to loading. There is no evidence contradicting the fact that, during the month of September, 1940, the Anghyra was drydocked in New York, where her hull plates were cleaned, scraped, surveyed, and painted. Her return voyage to Piraeus, Greece, consisted principally of a cargo of iron and the speed of the vessel was necessarily impeded by reason of the deadweight cargo. At Piraeus she discharged a portion of her cargo

4. There are two types or forms of bailing. The "tonga" pack indicates that one leaf is placed over another leaf. The "basma" bales are leaves of tobacco arranged in rows, with one row after another building up the bale.

and continued on to Istanbul, Turkey, where she arrived on October 28, 1940; the same day war was declared. The vessel having been requisitioned by the Greek Government, she was ordered to proceed to the port of Novorossisk, Russia, where she loaded a cargo of wheat and sailed for Salonika, Greece, where, after discharge of cargo, she was inspected by the Greek Government with the view to using her as a troop carrier. The vessel remained at Salonika from November 24, 1940, until December 19, 1940, awaiting further orders and, in the interim, negotiations were completed authorizing the voyage in question. She loaded 1,773 bales of tobacco in the No. 3 'tween deck (aft) and sailed for Bourgas, Bulgaria, on December 20, arriving December 24. Loading of bales of tobacco in all four holds continued until December 30, and on December 29 the vessel started taking on bunkers which, due to the primitive methods employed by the Bulgarian people, took four days to complete loading approximately 500 tons of coal. The vessel departed for Istanbul, Turkey, on January 2, 1941, where she arrived the following morning. She loaded more tobacco in holds Nos. 1, 2 and 4, as well as in the 'tween decks, and sailed late on the night of January 3 destined for Cavalla, Greece, where she arrived on the morning of January 5 and thereafter loaded bales of tobacco in the Nos. 1, 2, 3 and 4 'tween decks, and a few bales in the top center of the Nos. 1, 3 and 4 lower holds. Leaving Cavalla on January 6, she arrived at Piraeus on January 9 where she loaded a small quantity of tobacco in the 'tween decks, as well as the crates and boxes containing tins of olive oil which constitute a minor claim in this controversy. While at Piraeus, which was the final port of loading, the majority of the crew was conscripted into military service and the vessel was required to fill its complement by men sent to it from the labor pool. The Anghyra left Piraeus in convoy during the early morning of January 14,

and her subsequent arrival and departure dates are listed as follows:

| Port | Arrival | Departure |
|---|---|---|
| Piraeus | 1/9/41 | 1/14/41 |
| Port Said | 1/18/41 | 1/28/41 |
| Suez | 1/29/41 | 2/1/41 |
| Port Sudan | 2/5/41 | 2/12/41 |
| Mombassa, So. Africa | 2/27/41 | 2/28/41 |
| Durban, So. Africa | 3/10/41 | 3/11/41 |
| Pernambuco, Brazil | 4/1/41 | 4/2/41 |
| St. Thomas, V. I. | 4/13/41 | 4/13/41 |
| Newport News, Va. | 4/21/41 | 4/22/41 |
| Norfolk, Va. | 4/22/41 | |

The entire voyage from Salonika to Norfolk has been approximated to be 13,000 miles. Time consumed was 123 days as contrasted with approximately two months (including the time of loading and other delays at Salonika, Bourgas, Cavalla and Piraeus) for a voyage via Gibraltar. Additionally, it is apparent that a trip via Gibraltar commencing at Piraeus would involve cool weather, whereas the voyage via Suez and the Cape of Good Hope brought with it the attendant hot weather in twice crossing the Equator.

A schematic diagram in evidence fairly discloses the location of the various shipments as loaded on the vessel. At Salonika a shipment of 1,773 bales for Brown & Williamson was stowed in the No. 3 'tween deck forward. Upon arriving at Bourgas, Bulgaria, the major portion of the entire shipment was loaded, which, with one exception, was stowed in the lower holds. As to this exception, the evidence discloses that a shipment of 1,306 bales for Brown & Williamson outturned "soft and mouldy" after having been stowed in No. 3 'tween deck aft. All other shipments in the 'tween decks originated from Salonika, Cavalla, Istanbul, and Piraeus, and outturned sound. This is of some importance as the testimony substantially bears out respondent's contention that Bulgarian tobacco has a higher moisture content than the tobacco grown in Greece or Turkey. Summarizing the loadings in the lower holds, including small quantities placed in these holds at Istanbul and Cavalla, we find the following [5]:

5. Symbols adopted are as follows:
ATC—American Tobacco Co.—Greek tobacco shipped from Cavalla

BW—Brown & Williamson—Bulgarian tobacco shipped from Bourgas

| | Lower Hold | | Owner and Number of Bales | | Condition on Arrival | Approximate Location in Hold |
|---|---|---|---|---|---|---|
| (a) | No. 1 | | RJR | 8185 bls. | Damaged | Foreward — top to bottom |
| (b) | No. 1 | | BW | 5118 bls. | Damaged | Aft—top to bottom |
| (c) | No. 1 | | ATC | 161 bls. | Damaged | Top center of stow—separating (a) & (b) |
| (d) | No. 2 | | RJR | 6818 bls. | Sound | Foreward — top to bottom |
| (e) | No. 2 | | LM(B) | 592 bls. | Damaged | Aft—lower level |
| (f) | No. 2 | | LM(B) | 237 bls. | Damaged | Aft—center level |
| (g) | No. 2 | | LM(B) | 4878 bls. | Damaged | Aft—upper level |
| (h) | No. 2 | | LM(T) | 880 bls. | Damaged | Aft—upper level—adjacent to (g) |
| (i) | No. 3 | | LM(B) | 6068 bls. | Damaged | Fore and aft—across entire lower hold |
| (j) | No. 3 | | BW | 2846 bls. | Damaged | Foreward—top level |
| (k) | No. 3 | | RJR | 2580 bls. | Damaged | Aft—top level |
| (l) | No. 3 | | ATC | 135 bls. | Damaged | Top center of stow—separating (j) & (k) |
| (m) | No. 4 | | LM(B) | 6440 bls. | Damaged | Entire lower hold excepting (n) |
| (n) | No. 4 | | ATC | 196 bls. | Sound | Top center of stow over (m) |

Upon arrival at Newport News and Norfolk, the focal point of heat damage was substantially determined to be as follows:

No. 1 Hold—Approximately in the square of the hatch, near the center of the stow [6].

No. 2 Hold—Aft and starboard of the aft-starboard corner of the hatch, approximately midway the stow, in the lower portion of lot (g).

No. 3 Hold—Slightly aft of center of the square of the hatch, approximately midway the stow, in the lower portion of lot (k) above.

No. 4 Hold—Two focal points of heat damage; both of which were approximately midway the stow; the greater damage appearing slightly foreward of the foreward-starboard corner of the hatch; the lesser damage appearing at the foreward-port corner of the hatch.

LM(B)—Liggett & Myers—Bulgarian tobacco shipped from Bourgas

LM(T)—Liggett & Myers—Turkish tobacco shipped from Istanbul

RJR—R. J. Reynolds—Bulgarian tobacco shipped from Bourgas

6. While unnecessary for a determination of this case, it would appear from a fair preponderance of the evidence that the main focal point of heat damage occurred in lot (a) above, which is the RJR lot of 8,185 bales. There was, however, extensive heating in lot (b) above which is the BW lot of 5,118 bales.

Claimants urge that the focal points of heating damage reveal a pattern indicating a similarity of location which tends to show that the several heat pockets occurred midway the stow and in the square of the hatch. While there may be some merit to this contention, it is certainly not controlling in the final determination of this case as it could well be argued that the varied pattern of heat damage indicates the tobacco was subjected to an inherent vice. Once the heat damage is commenced, it is conceded that it will spread with some degree of rapidity, thus damaging the bales in the nearby vicinity. There is credible evidence to the effect that many of the bales were damaged more severely near the outer surface and this points to a lack of inherent vice in the particular bale, or that the outer damage was sustained from nearby bales which were perhaps subjected to inherent vice. As to the bales damaged on the outer surface with no heat damage, the respondent could not prevail if the respondent fails to establish by a fair preponderance of the evidence that the vessel was seaworthy and that the owners, operators and crew were free from negligence which may have attributed to the damage.

In designating the several lots stowed in the lower holds as "damaged", it is not suggested that the entire lot was in that condition. In some lots the percentage of damage was relatively small. The evidence is not complete on this point due in some respects to a noncooperative attitude on respondent's part at the time of arival at Newport News. From the BW lots stowed in the No. 3 lower hold and 'tween deck, slightly more than 8% was found to be partially damaged and slightly less than 1½% was totally damaged. In the No. 1 hold, BW sustained a total damage percentage of 35½%, with approximately 52% being partially damaged and in need of reconditioning which reconditioning resulted in two-thirds of the aforesaid 52% being placed in sound condition. ATC had slight damage to its lots in the top of the Stow in the Nos. 1 and 3 holds which amounted to only approximately $1,100.00. The damage to the RJR lots in the lower holds was considerably more extensive in holds numbered 1 and 3, where in excess of 21% was totally destroyed and a large part of the balance was partially damaged. On an average basis the LM lots revealed approximately the same percentage of damage as the RJR lots. This evidence affords an effective argument to the claimants who urge that the tobacco was not subject to an inherent vice as otherwise there would have been a greater percentage of damage.

■ The testimony leads to the inevitable conclusion that the tobacco was properly stowed in accordance with accepted practices then prevailing for a trip via Gibraltar with the ventilation afforded through the medium of air intractors and extractors. There remained, for a normal voyage, sufficient unused bale capacity indicating that the cargo was loosely stowed with air spaces permitting a reasonable amount of circulation to and from the holds. With one exception [7] all witnesses stated that the "block stowage" system employed was customary in the usage of the trade. With respect to stowage, a similar method was held to be proper and customary in American Tobacco Co. v. The Katingo Hadjipatera, 81 F.Supp. 438, 443, modified and affirmed 2 Cir., 194 F.2d 449, certiorari denied 343 U.S. 978, 72 S.Ct. 1076, 96 L.Ed. 1370. Furthermore, Reynolds had a representative present at Bourgas—Liggett & Myers made arrangements with Cotabul (the purchaser from the Bulgarian farmers) to have an employee report on loading activities at Bourgas—and the evidence indicates that other unidentified parties were pres-

---

7. The exception is Captain Evanson who testified that too much tobacco was stowed in the lower holds without a break or channel of space in the stow. But this witness does not contend that his own method of stowage is the accepted or general method employed.

ent at Istanbul and Cavalla who concerned themselves with stowage problems; none of whom registered any objection or offered any suggestion along these lines. While the burden of proper loading and stowage cannot be shifted from the carrier, the presence of these individuals significantly points to an accepted procedure under normal conditions.

■■ The effect of the war cannot be divorced from the facts of this case. Claimants' desire to transport their tobacco to the United States in order to protect their investments is appreciated. Certain risks, however, were common to all in negotiating the longer voyage around the Cape. Other risks, including the shortage of coal in Greece and the conscription of a portion of the vessel's crew at Piraeus, were directly attributable to the war effort. It became necessary to load bunkers at Bourgas under primitive methods causing a delay of approximately four days, and thereafter at Suez the vessel was required by action of the British Navy to take on additional coal of a poor quality. The shortage and poor quality of coal, as well as the conscription of the crew; were incidents of war which could not be avoided by respondent and delays resulting directly therefrom should not be chargeable to the carrier. The respondent has clearly met the burden of proof imposed by the Carriage of Goods by Sea Act, 46 U.S. C.A. § 1304, in that the normal incidents of war are tantamount to "any other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier". Due diligence was undoubtedly exercised as to these factors and this is all the law requires.

We turn, however, to the delays occasioned at Port Said, Suez and Port Sudan when the ventilating fans were turned off during the night hours due to the shutting off of the dynamo. At the outset it should be noted that respondent's general manager recognized the need for adequate and continuous ventilation when he instructed the master by letter as follows:

"It is necessary to use continuously the electric ventilation of the holds of your vessel, so that the tobacco will arrive in good condition."

On January 20, 1941, the British Admiralty at Port Said advised the master that lights had been observed on board the vessel the night of January 19–20 and, due to blackout regulations, the master was told that if lights were seen again, the Admiralty would open fire on the vessel. Returning to the vessel at approximately seven p. m. the master shut off the dynamo and the electric ventilation was not used thereafter from five p. m. to seven a. m. for a period of twelve consecutive nights. The electric fans in the ventilators were also shut off while at Port Sudan, Mombassa and Durban. It appears without contradiction that for at least 196 hours, including 168 consecutive night hours, the fans were not in operation.

The electric fans were installed within the ventilators and, when not turning, would tend to obstruct rather than aid the flow of air. During the daytime hours, with the temperature reaching as high as 87°, the hot air naturally accumulated in the lower holds as the fans in operation of necessity threw the hot air into these holds thereby building up the temperature. Had the fans remained in operation during the cooler hours of the night, the warm air would have been forced through the air extractors with the cooler air replacing it.

The British Admiralty did not order that the dynamo be cut off. The Master could have accomplished the same objective by removing the light bulbs from their sockets. Nor is there evidence tending to show that the master conveyed to the crew the seriousness of the situation. Undoubtedly the master was disturbed by reason of the non-cooperative attitude of certain members of his crew, but he likewise exhibited evidence of lack of ability to discipline his crew.

■■ Respondent points out that no witnesses testified that the cargo suffered

any damage because the fans were not in operation during blackout hours. Conceding this to be true as to any specific damage at that time, we turn to the evidence of the experts, both of whom agree that elements of time and ventilation are vital factors in considering the development of heat in tobacco. The word "heat" suggests the *effect* or *result* and not the *cause* of the trouble. That the tobacco heated is unquestioned. Did it self-heat by reason of inherent vice is the problem thus presented. Even though there may be strong inferences of inherent vice, the burden is on the carrier to prove what damage was attributable to causes excepted under the Carriage of Goods by Sea Act. Schnell v. The Vallescura, 293 U.S. 296, 306, 55 S.Ct. 194, 79 L.Ed. 373, 1934 A.M.C. 1573; The Nichiyo Maru, 4 Cir., 89 F.2d 539. There can hardly be any doubt that the conditions brought about by reason of the cessation of the night ventilation at least planted the seeds of damage to a cargo, stowed in a manner suitable for a normal trip of 60 days in normal winter weather, but requiring all available ventilating facilities and utmost care and diligence for a trip of 123 days under adverse conditions and warm weather. Holding that the master was negligent in failing to protect the cargo at Port Said, Suez, Port Sudan, Mombassa and Durban, and that damage resulted therefrom, the carrier has not met the admittedly difficult burden imposed by law in pointing out to what extent the inherent vice, if any, of the tobacco contributed to the damage. S. L. Shepard & Co. v. Agwilines, Inc., (The Cherokee), 4 Cir., 130 F.2d 67, 1942 A.M.C. 1451.

■ Carrier suggests that, even if negligence of the master be assumed with damage resulting therefrom, there can be no liability imposed as the act was in "the management of the vessel" for which the carrier is exonerated by § 1304, Subd.(2) (a) of the Carriage of Goods by Sea Act as follows:

"(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

"(a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship".

It is urged that the primary purpose of the dynamo was to supply electricity for the operation of the ship and only incidentally for the ventilator fans and, under the "primary purpose" rule, the master's act in shutting down the dynamo was an act "done for the safety of the ship herself and not primarily done at all in connection with the cargo"—it was, according to respondent, an act in the management of the vessel. The fallacy of this argument lies in the fact that there is an insufficient showing that the safety of the ship was impaired and that the act was indeed essential. Furthermore, while the primary purpose of the dynamo may have been associated with the operation of the ship under normal circumstances, it may be that the primary purpose changed when the vessel was at anchorage under blackout orders. Respondent relies upon the English case of Rowson v. Atlantic Transport Co., 2 K.B. 666 (1903), which is somewhat analogous to the present case, but the Rowson doctrine has been expressly rejected in The Jean Bart, D. C., 197 F. 1002, 1005, wherein it is said:

"The question therefore is whether the failure to properly use the ventilating equipment is a fault or error 'in navigation or in the management of the ship,' under the third section; or whether it is 'negligence, fault, or failure in proper * * * care of * * * merchandise or property committed' to the charge of the claimant. It sometimes happens that the duty of the ship's officers may relate both to the management of the ship and to the care of the cargo, and the rule has therefore become established that the proper classification in law of such a duty depends upon the purpose to which it primarily relates."

\*　　\*　　\*　　\*　　\*

"I am of the opinion that here the failure of the officers primarily related to the care of the cargo, and only incidentally, if at all, to navigation or the management of the ship. While possibly this view is at variance with certain expressions to be found in Rowson v. Atlantic Transport Co., 9 Aspinwall, Maritime Cases, 458, and in The Hudson (D.C.), 172 F. 1005, it is not inconsistent with anything said or decided in The Silvia, 171 U.S. 462, 19 S.Ct. 7, 43 L.Ed. 241, and upon principle finds support in Knott v. Botany Worsted Mills, 179 U.S. 69, 21 S.Ct. 30, 45 L.Ed. 90; The Germanic, [2 Cir.], 124 F. 1, 59 C.C.A. 521; [Id.] 196 U.S. 589, 25 S.Ct. 317, 49 L.Ed. 610; Corsar v. J. D. Spreckels & Bros. Co., 9 Cir., 141 F. 260, 264, 72 C.C.A. 378; and The Musselcrag, D.C., 125 F. 786."

The Jean Bart significantly points out the carrier's duty on "the longest commercial voyage of the modern world" and suggests that conduct reasonably prudent under one set of circumstances may be grossly negligent under another. Under the circumstances presented in the instant case we are required to examine with care the carrier's obligations.

The doctrine enunciated in The Jean Bart, supra, has been approved in Schnell v. The Vallescura, supra, Andean Trading Co. v. Pacific Steam Nav. Co., 2 Cir., 263 F. 559, The Samland, D.C., 7 F.2d 155, Philippine Sugar Centrals Agency v. Kokusai Kisen Kabushiki Kaisha (The Naples Maru), 2 Cir., 106 F.2d 32, and other authorities too numerous to cite. Clearly the Rowson rule is not recognized in this country.

Finally as to this point, the evidence discloses that the master acknowledged the primary purpose in using the dynamo when he stated to the British Admiralty that he was "obliged to keep the dynamo working * * * for the ventilation of the cargo we have on board". When we consider the fact that the master could have removed the light bulbs or, in the alternative, pulled only one of the five main switches to eliminate the possibility of light in the crew's quarters, in which event approximately 90% of the ventilator fans would have continued in operation, the negligence of the master in disregarding the safety of his cargo is rather apparent.

What may have been normal stowage under normal atmospheric conditions with adequate ventilation, may quickly resolve itself into improper stowage under adverse weather conditions and a cessation of ventilation for long periods of time. One need only study the schematic diagram to note that tobacco stowed in the 'tween decks was substantially undamaged with the exception of 1,306 bales for Brown & Williamson stowed in No. 3 'tween deck aft. As to this exception, there is no showing of inherent vice in the tobacco—the evidence merely discloses that it outturned "soft and mouldy". Even as to this lot it appears that the damage was not serious and is probably explained by the fact that it was stowed in an enclosed storage locker where the ventilation was retarded to some extent. In fact, respondent's witnesses indicate that any damage to the 1,306 bales was minimal. Nor is there any showing that greater damage was evidenced in the less expensive grades of tobacco; the resultant damage being comparable in each instance. Bearing in mind all of the circumstances surrounding this shipment, it is inescapable that the lack of ventilation constituted a substantially contributing cause of the heat damage to the tobacco.

Experts approximated the normal amount of moisture content in Greek and Bulgarian tobacco after fermentation to be from 12% to 15%, all of which is conceded to be within the safety factor. The respondent's witness, Dr. Turner, testified that moisture content in excess of that amount is likely to cause self-heating, but admits that this percentage is not necessarily the optimum content. On cross-examination Dr. Turner was questioned at length as to his testimony given in the Exmoor case

**748**

approximately fifteen years prior thereto, where claimants contend that this same witness stated that the optimum moisture content for fermentation of tobacco ranged from 20% to 24%. As the witness could not recall his prior testimony given on October 5, 1938, claimants sought to introduce a certified copy of the Exmoor appeal record to contradict him. The official court reporter who took the testimony in the Exmoor case is no longer available and his notes have long since been destroyed. While the general rule is well settled that in contradicting a witness as to evidence given at a prior trial the testimony of the court reporter constitutes the best evidence as to what was said, yet where an official reporter transcribed the testimony which is part of the official record in the appellate court, it is proper to consider the appeal record as a substitute for what would have been the best evidence if the reporter had been available to read from his notes. The alleged contradictory testimony is admissible under the circumstances of this case. The testimony of the witness in the Exmoor case was reported and transcribed by one of three official reporters during 1938. One is now dead; the second has been missing for many years; and the third has no recollection of having reported the case. There is, of course, authority to the effect that such evidence should be excluded [8] and there can be much dispute on this subject where the reports of a private stenographer are in issue, but when the transcript is accepted by an appellate court without challenge and an official reporter prepares the transcript in the *regular course of business*, logic dictates that a certified copy of the appeal record may be accepted as evidence where the best evidence is no longer available. Wigmore on Evidence, 3rd Ed., Vol. V, § 1669, p. 667–671.

The witness, Dr. Turner, stated that, assuming he had so testified in 1938, he would not now adhere to his former statement. Even so, the prior testimony gives rise to the belief that the optimum moisture content for safety is not confined to 15%. The evidence reveals that the moisture content of the tobacco in terms of weight or volume was not precisely determined prior to shipment, but approximately seven of the fifteen lots outturned either wholly sound or damaged by heat from other lots. As to the remaining eight lots, portions outturned sound or were damaged by heat from other lots. As respondent's expert, Dr. Turner, further stated that the optimum moisture content was dependent upon a combination of factors including temperature, time and nutriment elements, and as the rate at which fermentation progresses undoubtedly increases where the heat is confined, the importance of continuous adequate ventilation cannot be overlooked.

In the absence of evidence conclusively establishing the moisture content at the time of shipment, we look to the condition of the tobacco upon arrival at its destination. There is a sharp conflict as to cause of the heating and, while there are some inferences that the heat commenced in the heart of the stow, there are likewise inferences to the contrary. More significant is the fact that the weight of the testimony leads to the conclusion that the damage had a tendency to progress from the outside of the bale toward the center, thus indicating that inherent vice was not a predominant factor.

As the claimants have presented evidence to the effect that the tobacco, when loaded on the vessel, was in "apparent good order and condition", the burden as pronounced in this Circuit apparently rests upon the carrier to explain the cause of damage, or, in the alternative, to show freedom from negligence. Philippine Sugar Centrals Agency v. Kokusai Kisen Kabushiki Kaisha (The Nichiyo Maru) supra. The controlling decision in this Circuit has been the subject of some difference of opinion by reason of authorities from the Second Circuit. The Niel Maersk, 2 Cir., 91

8. Rice-Brown Lumber Co. v. Fleetwood, 134 Ark. 340, 203 S.W. 692.

F.2d 932, certiorari denied 302 U.S. 753, 58 S.Ct. 281, 82 L.Ed. 582; American Tobacco Co. v. The Katingo Hadjipatera, D.C., 81 F.Supp. 438, 446–447, modified on other grounds 2 Cir., 194 F.2d 449, certiorari denied 343 U.S. 978, 72 S.Ct. 1076, 96 L.Ed. 1370; Kupfermann v. United States, 2 Cir., 227 F.2d 348; Hecht, Levis & Kahn, Inc., v. The S. S. President Buchanan, 2 Cir., 236 F.2d 627. The theory adopted by the Second Circuit infers that the carrier's burden of proving that damage comes within 46 U.S.C.A. § 1304(2) (q) does not relate to the "inherent vice" exception contained in 1304(2) (m). This Court is, however, obliged to follow the rule in this Circuit, and where the claimants have at least gone forward with the evidence to show that the shipment was loaded in "apparent good order and condition", the burden of proof must rest with the carrier when relying upon "inherent vice" as a defense, to establish by a fair preponderance of all of the evidence that the cause of damage rested in "inherent vice". This burden has not, in the opinion of this Court, been met, and accordingly respondents are liable for the tobacco damaged by heat.

### Tobacco Damaged During Loading Operations

Three bales of Brown & Williamson tobacco and one bale of Liggett & Myers tobacco were dropped overboard during loading operations. They were recovered, forwarded to destination, and delivered in damaged condition. The defense that such action was due to the negligence of the longshoremen, not directly under the employ of respondents, is untenable. The Carriage of Goods by Sea Act, 46 U.S.C.A. § 1303(2), requires the carrier to "properly and carefully load" the goods carried. This duty was never fulfilled. The claimants are entitled to a decree in their favor as to the damaged bales dropped overboard by the longshoremen.

### Tobacco Damaged by Sweat

A minor claim involves sweat damage to nine bales owned by American Tobacco Company which had been stowed in the No. 1 'tween deck. It is obvious that such damage was caused by steam from the heated bales of the other lots. There is no evidence that the damage resulted from one of the specified causes referred to in § 4 of the Carriage of Goods by Sea Act, and the "omnibus" clause is applicable. As the Court has heretofore determined that respondent is liable for heat damage, it follows that similar liability must be imposed for sweat damage.

### Damage to Olive Oil in Tins

The intervening libellant, A. Fantis, has filed a claim for damage to three shipments of olive oil in tins, packed in cases, and shipped from Piraeus, Greece. The bills of lading are "clean" and there is no suggestion that the shipments were leaking at the time of loading. While an examination of the 29 damaged cases did not take place until the shipments reached New York, following transshipment from the Anghyra, the evidence abundantly establishes that the leakage was first noticed on the Anghyra.

There is a conflict in the testimony as to whether the cases containing the tins of olive oil were stowed on deck or in the cross bunker. The bill of lading contained no notation as to the place of stowage and, if the shipments were on deck, the carrier would be liable as for deviation. The Delaware, 14 Wall. 579, 20 L.Ed. 779.

We do not, however, reach the point of determining the place of stowage. The condition of the tins at the time of shipment is not revealed by the evidence and, of course, could not be readily observed as they were packed in wooden cases. At the point of destination the tins were buckled and dented in places, and olive oil had escaped from ends of the tins at split or cut seams. There is an intimation that the soldering or construction was not of the best, but there is no evidence supporting this view. It is at least as probable that the damage was due to rough handling. Once again the

burden must rest upon the carrier to explain the cause of damage or freedom from negligence and this it has failed to do.

### Damage to Tobacco in No. 1 Hold by Sea Water

■ Upon discharge of 42 bales of R. J. Reynolds tobacco from the bottom tier of the No. 1 lower hold, on either side of the fore and aft bulkhead, it was noted that the bales were wet and tests revealed the same to be due to salt water. Survey of the vessel after the voyage disclosed that approximately 100 rivets at the forepeak were "weepy" but not slack or wasted, and only needed caulking. The evidence rather conclusively shows that the vessel was seaworthy at the commencement of the voyage; it having been drydocked in New York in September, 1940, where her hull plates were cleaned, scraped, surveyed and found to be tight and in good condition. The cargo of wheat discharged at Salonika on December 3, 1940, was "dry and in good order". The bilge soundings were normal throughout the voyage until the vessel ran into abnormally heavy weather in the South Atlantic on April 5, 1941.

There is authority to the effect that where damage is confined to one part of a vessel and the remainder withstands like strains, this is evidence of unseaworthiness as to the part which fails. Southwestern Sugar & Molasses Co. v. Artemis Maritime Co., D.C., 92 F.Supp. 631, affirmed 4 Cir., 189 F.2d 488. Such evidence is not, however, conclusive, and the high seas and gale winds on the day in question point to a near hurricane. The cargo on board approximated 3,200 tons and, as such, the vessel was lightly loaded, thus bringing her bow high out of the water. The stress and strain on the rivets in the vicinity of the forepeak and No. 1 hold is understandable. In any event due diligence was exercised by the carrier in making the vessel seaworthy prior to entering upon the voyage. There is no liability upon the carrier for the damage to the 42 bales referred to herein.

### Respondent's Claim for Demurrage on Cross-Libel

■ The bills of lading issued to Brown & Williamson, Liggett & Myers and A. Fantis contain provisions that the carrier is entitled to demurrage for delays of the vessel due to action of governmental authorities. The cross-libellant agreed with The American Tobacco Company and a subsidiary of R. J. Reynolds Tobacco Company that it would not enforce this provision of the bills of lading against them. Demurrage of all the cargo owners is alleged to be $44,100.00, but recovery is sought only as follows:

| | |
|---|---|
| From Brown & Williamson | $ 7,290.00 |
| From Liggett & Meyers | 17,130.00 |
| From A. Fantis | 305.00 |

The cross-respondents point out that such an agreement constitutes a preference which is prohibited by the Shipping Act (46 U.S.C.A. § 812, 815, 816) and by the Carriage of Goods by Sea Act (46 U.S.C.A. § 1308, 1309), citing in support of their argument the following cases: Compagnie Generale Transatlantique v. American Tobacco Co., 2 Cir., 31 F.2d 663; Hays v. The Pennsylvania Co., C.C., 12 F. 309; Sullivan v. Minneapolis & R. R. Ry. Co., 121 Minn. 488, 142 N.W. 3, 45 L.R.A.,N.S., 612; Cook & Wheeler v. Chicago, R. I. & P. Ry. Co., 81 Iowa 551, 46 N.W. 1080, 9 L.R.A. 764.

The carrier counters by stating that the Anghyra was a "tramp" vessel specifically exempt from the provisions of the Shipping Act (46 U.S.C.A. § 801) but, if not a "tramp", this Court is without jurisdiction to determine the issue as exclusive jurisdiction of such a matter rests with the Federal Maritime Board, formerly the United States Shipping Board. United States Navigation Co. v. Cunard S. S. Co., 284 U.S. 474, 487, 52 S.Ct. 247, 76 L.Ed. 408; Far East Conference v. United States, 342 U.S. 570, 574, 576, 72 S.Ct. 492, 96 L.Ed. 576. As any complaint alleging discrimination must be filed with the Board within two years after the date of the alleged violation (46 U.S.C.A. § 821), the time has

long since elapsed with no claim having been filed.

■ The cross-respondents filed exceptive allegations to the cross-libel setting forth the defense of laches, and that the cross-libel fails to state a cause of action for the reason that the transportation of cargo therein referred to was subject to the Carriage of Goods by Sea Act reading in part as follows (46 U.S. C.A. § 1304(3)):

"(3) The shipper shall not be responsible for loss or damage sustained by the carrier or the ship arising or resulting from any cause without the act, fault, or neglect of the shipper, his agents, or his servants."

Cross-respondents further state that the cross-libel affirmatively alleges that damage resulted from acts of public authorities.

Cross-libellant, Hellenic Lines, Limited, proceeded to file replies to the foregoing exceptive allegations which, in substance, point out that no unreasonable delay occurred in asserting the claims set forth in the cross-libel; that, prior to the institution of the original action by the shippers, communication with Greece was cut off by the German occupation of Greece; that limited communication was not permitted until late 1944; and that until the general manager of Hellenic Lines reached the United States in October, 1945, it was impossible for proctors adequately to discuss the pending litigation with cross-libellant.

The libel and intervening libels were filed in 1941, but the cross-libel was not filed until February 25, 1946. The bills of lading, upon which the claims for demurrage are predicated, were issued in December, 1940, and January, 1941, but the shipments did not arrive in the United States until April, 1941. The applicable state statute of limitations in Virginia is five years. Code of Virginia, 1919, § 5810; Code of Virginia, 1950, § 8–13. The time begins to run "after the right to bring the same shall have first accrued". In the instant case more than five years had elapsed from the date of the issuance of the bills of lading to the date of the filing of the cross-libel, but less than five years had passed if the right of action first accrued when the cargo arrived at its destination. The clauses of the bills of lading in controversy contain the following:

"Demurrage at the rate of fifty cents American currency per gross register ton per running day shall be due for any delay through action of Authorities plus the actual cost of deviation of each ship when taken to a port out of her way until brought back to the same point and any disbursements to be incurred at said port. All these items shall be apportioned over the value of the cargoes as per statement to be drawn up by the Company's Average Adjuster."

Under this provision of the bills of lading it would be impossible to determine the amount due thereon until the vessel arrived in the United States. The right to bring any action thereon first accrued when the vessel arrived at Newport News on April 21, 1941. Hence the cross-libel was filed within the limitation period as prescribed by the laws of Virginia.

■ Courts appear to be reluctant to hold a party guilty of laches where the period is shorter than the applicable state statute of limitations; the latter being the prima facie test of the measure of staleness in admiralty. Each case must rest upon a proper exercise of discretion and, in this proceeding, it cannot be successfully urged that cross-respondents have been unduly prejudiced in defending the claims in the light of the war conditions prevailing. True, the cross-libellant appeared by its proctors in defense of the original and intervening libels and much testimony was taken in the interim period, but upon the narrow issue as presented by the cross-libel the defense of laches cannot be sustained.

Indeed it should be noted that the exceptive allegations were overruled by District Judge Hutcheson on November

12, 1946, which may foreclose any further consideration of the matter at this time, but, assuming the right of the present district judge to reverse the order of his distinguished predecessor, such action would not be justified. The record does not disclose that the cross-respondents have ever answered the cross-libel.

Assuming arguendo that the Court should properly consider the defense of "preference" interposed by cross-respondents in their briefs, it is not clear that the provisions of the Shipping Act (46 U.S.C.A. § 812, 815, 816) are applicable to the Anghyra in view of its probable status as a "tramp" vessel. The original definition of a "tramp" is revealed in a report of the United States Shipping Board Bureau of the Department of Commerce, 1 U.S.M.C. 470, 498, wherein it is said:

"Section 1 of the Shipping Act, 1916, excludes from the regulatory provisions of that Act every 'cargo boat commonly called an ocean tramp' * * * As defined earlier in this report a tramp is a carrier transporting on any one voyage cargo supplied by a single shipper only under a single charter party or contract of affreightment. The best example of such a carrier is the tanker."

Tested alone by these principles, the Anghyra would not meet the definition of a "tramp" vessel, but thereafter the Maritime Commission modified this ruling on pages 2 and 4 of its report to Congress, House Doc. No. 520 (1938), 3rd Session, 75th Congress, in the following respects:

"A differentiation of the functions of tramp and liner was well stated by a British Royal Commission on Shipping Rings, as follows:

'* * * The tramp, on the other hand, is a self-contained unit of transport. It is not attached continuously to any given trade route; it does not conduct its operation in concert with others. Its sailings are determined by no fixed plan. The function of the tramp, in short, is to fluctuate from one route to another, according to the shifting requirements of the various trades. Its movements are determined by the law of supply and demand; it goes where its voyage will yield the greatest profit; and it undertakes no obligation beyond that involved in each particular venture.'

* * * * *

"* * * Often, however, it renders a service analogous to that of a common carrier, for when a tramp is placed 'on the berth', the owner, operator, or agent announces that the vessel will sail for a given destination at a given time and he advertises for a full cargo or for smaller shipments to fill space not already contracted for."

The foregoing definition was confirmed in 1943. See 2 U.S.M.C. 681–683.

It may be argued that, prior to the outbreak of the war, the cross-libellant had expressed an intention to establish a service to carry tobacco to this country via Gibraltar. Despite these intentions, the war disrupted these plans and the carrier at no time established a service to United States via the Suez Canal. The vessel's release from requisition was only for one trip via Suez. It is the opinion of this Court that the Anghyra was a "tramp" vessel, and therefore not subject to the provisions of this Shipping Act relating to "preferences".

It is unnecessary to discuss the interesting questions presented by proctors for the parties relating to the jurisdiction of the Court, and whether the matter of a "preference" must first be considered by the Federal Maritime Board as a condition precedent to action by this Court. In addition to the authorities heretofore cited, the following cases are of interest on these points. Prince Line v. American Paper Exports, 2 Cir., 55 F.2d 1053, 1056; Texas & Pacific Ry. Co. v. Interstate Commerce Commission, 162 U.S. 197, 16 S.Ct. 666, 40 L.Ed. 940; Compagnie Generale Transatlantique v. American Tobacco Co., 2 Cir., 31 F.2d 663; American Union Transport v. River Plate & Brazil Conferences, D.C., 126 F.

Supp. 91; Isbrandtsen Co. v. United States, 93 U.S.App.D.C. 293, 211 F.2d 51; D. L. Piazza Co. v. West Coast Line, D.C., 113 F.Supp. 193, affirmed 2 Cir., 210 F.2d 947, 1954 A.M.C. 414, certiorari denied 348 U.S. 839, 75 S.Ct. 42, 99 L.Ed. 661; D.C., 119 F.Supp. 937, 1954 A.M.C. 317.

Reserving for further consideration the amounts due by the cross-respondents on the cross-libel, a decree in favor of the cross-libellant is in order.

Proctors for the libellant and intervening libellants will prepare a decree in accordance with this opinion, which is adopted by the Court as its findings of fact and conclusion of law pursuant to General Admiralty Rule 46½, 28 U.S. C.A. with the right of all proctors to submit any other specific inquiries which may have been omitted herein. Matters of damages, interest and costs are reserved.

The decree will be entered upon presentation following endorsement of the several proctors.